[No. 64085-8. En Banc.]

Argued November 19, 1998. Decided October 7, 1999.

THE STATE OF WASHINGTON, *Respondent*, v. CLARK RICHARD ELMORE, *Appellant*.

*Clark Elmore*, pro se.

*Cohen & Iaria*, by *Michael P. Iaria*; *Meredith M. Rountree*; and *Griffith & Cole*, by *Rita J. Griffith*, for appellant.

*David S. McEachran, Prosecuting Attorney*, and *Laura D. Hayes, Deputy*, for respondent.

TALMADGE, J. — After pleading guilty to rape and ag-

gravated first-degree murder, Clark Richard Elmore was sentenced to death when a Whatcom County Superior Court jury determined he did not merit leniency. Elmore now seeks review of his conviction and sentence pursuant to RAP 4.2(a)(6) and RCW 10.95.100, raising numerous allegations of error, both significant and insignificant. We affirm Elmore's conviction and sentence.

## ISSUES

1. Was the information charging Elmore with aggravated first-degree murder inadequate?

2. Was Elmore's plea of guilty knowingly and intelligently made?

3. Does Elmore's appearance in shackles on the first day of voir dire require reversal of his sentence?

4. Can Elmore challenge the prosecutor's questioning of potential jury members for the first time on appeal?

5. May Elmore challenge the statement of the case read by the court to the venire when he proposed such statement and presentation?

6. Did references to defendant during trial as "James Dickey" deny him a fair sentencing hearing?

7. Was the admission of autopsy photographs proper?

8. Was evidence regarding Elmore's prior molestation of the homicide victim properly admitted?

9. Are instructions 3 and 8 improper; and did the trial court err in refusing Elmore's proposed instruction 15?

10. Should the Sentencing Reform Act of 1981 (SRA) washout provisions be applied to Elmore's prior convictions?

11. Has Elmore met his burden in asserting the State's closing argument denied him a reliable sentencing?

12. Was reversible error committed where the jury played the tape of Elmore's confession during deliberations?

13. Did the presence of alternate jurors in the jury room

prior to the reading of the verdict amount to reversible error?

14. Does the trial court have authority to conduct a proportionality review?

15. Is Elmore's sentence supported by the record; if so, is it disproportionate, excessive, or the result of passion or prejudice?

## FACTS

On Monday evening, April 17, 1995, Sue Ohnstad contacted the Bellingham Police Department to report that her 14-year-old daughter Kristy failed to return home from school. Kristy's name was then entered in the missing person's database.

The following day, a passerby, Willie Golightly, stumbled across Kristy's backpack in a ditch off Samish Way in Bellingham and among its contents found a sweatshirt and Sue Ohnstad's phone number; he called Ohnstad and informed her of the discovery. Clark Elmore, who at the time was known only as James Dickey, arrived at Golightly's residence shortly thereafter. Elmore, Ohnstad's partner of 10 years, considered himself to be Kristy's stepfather; he was also the biological father of Kayla, Kristy's stepsister. Elmore introduced himself to Golightly, said the articles belonged to his stepdaughter and asked to take them home. Golightly refused to return the backpack and its contents until the police arrived.

Officer Scott Matsudaira was dispatched to Golightly's residence. Golightly showed the officer the sweatshirt, the backpack, and the place where he had found them. Elmore did not accompany them, but spoke briefly with the officer when they returned to Golightly's. Matsudaira described Elmore as being "very distraught, very upset." 16 Report of Proceedings at 2442.

On Thursday, April 20, Bellingham Police Detective Les Gitts began a formal investigation into Kristy's disappearance. Detective Gitts interviewed Ohnstad and Elmore. El-

more told Detective Gitts he had received a phone call the night before from someone who reportedly saw Kristy downtown with a boy. Detective Gitts interviewed several of Kristy's friends, including the boy, but no one had seen her.

By Friday, April 21, Elmore had commissioned his own search party to look for Kristy. After publicly criticizing the inaction of police in the case, he organized a group of neighbors to search the area where Kristy's backpack was discovered. Several homeowners called the sheriff's office complaining that unidentified people were traipsing through their yards. At this point, the Whatcom County Sheriff's Office became involved. Whatcom County Search and Rescue assembled a command post off Samish Way and canvassed the area with marked rescuers.

That afternoon, Detective Gitts and another detective contacted Elmore at the command post, inviting him to drive down the road with them and talk about the situation. Elmore was advised he was not under arrest and was free to terminate the conversation at any time. Elmore agreed to speak with the detectives and also consented to their taping of the conversation.

During the 45-minute discussion, Elmore reported last seeing Kristy on Monday morning, April 17. He stated he dropped her off in front of the BP gas station where a group of kids were waiting for school to start. Elmore described what Kristy was wearing. He also reported Kristy had recently begun "acting out" at home. Elmore explained he and Ohnstad were having problems disciplining Kristy and did not approve of her new friends. Although Elmore said he had no idea where Kristy could be, he did not think she was still "kickin." Pl.'s Ex. 13 at 21. Elmore also told Detective Gitts that Ohnstad had questioned him about Kristy's disappearance.

After the interview, when Detective Gitts took Kristy's backpack out of his truck, Elmore became "extremely pale [and] shaky" when he saw it and looked like he was going to vomit. 14 Report of Proceedings at 2316. Detective Gitts

drove Elmore back to the search base and asked Elmore if he could take a look in Elmore's van. Detective Gitts offered Elmore a written consent to search form, advising Elmore such consent would allow the police to examine his van for trace evidence, including blood, hair, and fibers. Elmore agreed to the search and signed the consent form. Using a flashlight, Detective Gitts conducted a cursory search of the interior, but found no obvious signs indicating Kristy had been inside the van.

That same evening, at about 8:30 P.M., Detective Gitts received a call from the Search and Rescue Team indicating a female body had been discovered near the south end of Lake Samish. Detective Gitts and another detective drove to the scene and tentatively identified Kristy's body, although further processing was delayed until daylight. Detective Gitts returned to the station and phoned Elmore, informing him the searchers had retired for the night, but assuring him they would return in the morning. Because Elmore was now a person of interest, he was not informed Kristy's body had been located. Instead, Elmore was told the searchers planned to scour the area south of Lake Samish to see if Elmore would return to the scene and attempt to move the body.

At 7:30 A.M., on Saturday, April 22, 1995, investigators from the Sheriff's Office and the Bellingham Police Department met to process the crime scene. They found Kristy's body laying face down on the ground beneath a plastic tarp. Her shirt was pulled over one shoulder and she had a plastic bag over her head. Other than the shirt and socks, she was naked. When investigators removed the bag, they found a black belt around her neck and a metal spike protruding from her ear. Animals had removed portions of her ears. Two red flecks of paint were recovered from the body. The flecks were eventually traced back to a red toolbox Elmore kept in his van. While investigators processed the crime scene, Detective Gitts attempted to contact Elmore by phone. Sue Ohnstad answered this call and reported Elmore had left to run errands, but she expected him back shortly. Elmore never returned.

Later that afternoon, Detective Gitts issued an interstate bulletin describing Elmore and his van, requesting Elmore be detained as a person of interest in the homicide investigation. Port of Seattle Police responded to the broadcast, reporting the van had been impounded from Sea-Tac International Airport for unpaid parking fees. Detective Gitts secured a warrant and had the van returned to Bellingham.

On Sunday evening, April 23, at about 9 P.M., Elmore appeared at the Bellingham Police Station and used the after-hours phone outside the station to call 911. When the dispatcher answered, Elmore instructed her to send an officer out to lock him up for murdering Kristy Ohnstad. Officer Alvin Carr responded to Elmore's call. Elmore told Officer Carr that he needed "to talk about killin' [his] daughter." Officer Carr invited Elmore into the station. 16 Report of Proceedings at 2449.

Once inside the station, Lieutenant Richard Sucee advised Elmore of his constitutional rights both orally and in writing. After agreeing to waive his rights, Elmore spoke briefly with Lieutenant Sucee while another officer paged Detective Gitts. Elmore told Lieutenant Sucee that he killed Kristy in his van at a location near Lake Samish.

When Detective Gitts arrived, Elmore consented to a more detailed tape-recorded interview. Elmore explained that, on Monday morning, April 17, he dropped Kayla off at day care and returned home about 8:20 A.M. Kristy was complaining about going to school and had missed her bus. When Elmore told Kristy she was "grounded forever," she commented about Elmore molesting her. When detectives pursued the subject, Elmore acknowledged molesting Kristy when she was five years old. He said that after the incident, whenever he tried to discipline Kristy, she threatened to turn him in for the molestation. Elmore confessed he considered killing Kristy "[j]ust about every time" she threatened him. Clerk's Papers at 205. He also said he wished Kristy had followed through on these threats because it "[c]ost her her life." Clerk's Papers at 204.

When Kristy mentioned the subject on this day, Elmore told her to "shut up." Clerk's Papers at 209. They got in the van and Elmore drove toward Kristy's school. Along the way, Elmore snapped. Instead of dropping Kristy off at school, he continued driving. Some 20 minutes later, he reached the far end of Lake Samish where he pulled the van onto a secluded dirt road and parked. Elmore unbuckled Kristy's seat belt and warned her it was time she learned to do as he told her or "she'd get seriously hurt." Clerk's Papers at 214. Elmore grabbed Kristy by the shirt and pulled her to the back of the van. He told her to take her clothes off or she was going to get hurt. She refused, and Elmore forcibly removed them. Kristy cried and pleaded, but Elmore raped her. Elmore acknowledged Kristy did not fight him because "she wasn't strong enough to fight [him]." Clerk's Papers at 216; 15 Report of Proceedings at 2411-12 (Kristy was 14 years old, "five feet six inches tall, slim, slender build," and weighed "about a hundred and five pounds").

After raping Kristy, Elmore placed his hands around her neck and manually choked her. He then wrapped Kristy's belt around her neck and cinched it tightly. Afterward, he took a nine-inch metal, needle-like tool from his toolbox and forced it into Kristy's left ear approximately five and a half inches, piercing Kristy's brain. Elmore thought Kristy was still making noises, so he covered her head with a plastic bag and repeatedly bludgeoned her skull with a sledgehammer until he was sure she was dead. Elmore then dragged Kristy's nude body into the woods, covered her with a plastic drop cloth, got back into his van and drove away. On the way back to town, Elmore threw Kristy's shoes, panties, and school papers out the window. He then stopped for gas and continued on with his normal daily activities.

The following day, Tuesday, Elmore tossed Kristy's backpack in a ditch along Samish Way. On Wednesday, he cleaned the interior of his van. By Friday, Elmore had organized his own search party. Elmore admitted he

contacted the media and publicly criticized the police to "draw heat off of me" and to "cover my tracks." Clerk's Papers at 241-44.

On Friday evening, Elmore started to get concerned when he learned searchers were planning to comb the area where he dumped Kristy's body. The next morning, he told Sue he had to run some errands. Elmore took the checkbook and some cash, gassed the van, and drove to Sea-Tac Airport. He parked his van in a temporary lot, took a cab to the bus station, and caught a bus for Oregon. Elmore reached Eugene at about 7:00 P.M. and spent the night under a bridge. The next morning, Elmore walked to the county courthouse, intending to obtain identification using his twin brother's identity. He abandoned that plan, however, and decided to return to Bellingham. He caught a plane in Eugene and arrived in Bellingham about 9:00 P.M. Elmore took a cab to the Bellingham Police Department and turned himself in.

On April 24, 1995, Elmore appeared before Commissioner Charles Snyder at a "first appearance" hearing where he received a form explaining his constitutional rights, which he acknowledged he read and understood. The prosecutor then read into the record a statement of facts sufficient to establish probable cause for Elmore's detention. Commissioner Snyder advised Elmore of his right to counsel. When Elmore waived counsel, the commissioner explained the ramifications of proceeding pro se. Elmore responded by admitting guilt. The commissioner abruptly interrupted him and appointed standby counsel. Bail was set at one million dollars.

The following day, Elmore appeared before the Honorable Steven J. Mura, of the Whatcom County Superior Court, for a hearing on the State's motion to release Kristy's body for burial. The body was released without objection and at the conclusion of the hearing, the court officially appointed Senior Deputy Public Defender Jon Komorowski to represent Elmore.

On April 27, 1995, Clark Richard Elmore, also known as

James Lee Dickey, was charged by information with one count of aggravated first degree murder, RCW 9A.32-.030(1)(a) and former RCW 10.95.020(7) and (9)(b) (1994), and two counts of second degree rape, former RCW 9A.44-.050(1)(a) (1994). The affidavit of probable cause and information accused Elmore of murdering Kristy (1) "to conceal a commission of a crime or to protect or conceal the identity of the person committing a crime" and (2) "in the course of, furtherance of, and immediate flight from Rape in the Second Degree[.]" Clerk's Papers at 839, 842-47; *see also* former RCW 10.95.020(7) and (9)(b) (1994).

On May 11, 1995, Elmore appeared before the Honorable Michael Moynihan for arraignment. No formal plea was entered because of the 30-day time frame allowed by former RCW 10.95.040(2), during which the State could elect to file a notice of intent to seek the death penalty. The State allowed Elmore's counsel additional time to present mitigating information to the State.

On June 28, 1995, the State filed a Notice of Special Sentencing Proceeding pursuant to former RCW 10.95.040, apprising Elmore of the State's intent to seek the death penalty. The following day, Elmore appeared for arraignment before Judge Mura. Elmore orally pleaded guilty to aggravated murder in the first degree, but deferred entering pleas on the remaining rape counts. The trial court, however, did not formally accept the plea at that time and continued the hearing.

At his next appearance on July 6, 1995, Elmore entered a plea of guilty to count 2 of the information, rape in the second degree, and the prosecutor orally dismissed count 3. The prosecutor read into the record a statement of facts in support of Elmore's pleas. Elmore acknowledged the prosecutor's statement to be "substantially true and correct," and he was "freely and voluntarily" pleading guilty. Elmore's counsel asserted he believed Elmore to be mentally competent; he had personally discussed pleading guilty with Elmore and was confident Elmore understood the nature of the crime, his desire to accept full responsibil-

ity and his wish indeed to plead guilty. Hearing (July 6, 1995) at 17-24, 27-29. Judge Mura advised Elmore of the constitutional rights he was forfeiting by pleading guilty. Elmore again affirmed his decision to plead guilty and submitted a written CrR 4.2(g) Statement of Defendant on Plea of Guilty. At the conclusion of the hearing, the court formally accepted Elmore's guilty pleas to aggravated murder in the first degree and one count of second degree rape as freely and voluntarily given.

On February 20, 1996, the parties convened before the entire jury pool. The court read an agreed statement of the case and preliminary instructions developed by counsel for Elmore and for the State. Elmore appeared in jail garb that day with his hands and feet manacled. After that first day, and for the remainder of voir dire and trial, Elmore appeared in jail garb only. Over the next two weeks, both parties questioned jurors. A final panel was selected on March 6 and the court entertained additional pretrial motions and discussed jury instructions outside the presence of the jury. Trial on the penalty phase commenced the afternoon of March 6.

The State's first witness was Detective Gitts, who recounted details of the investigation that eventually led to Elmore's arrest and confession. Detective Gitts also played both taped interviews for the jury. During Detective Gitts testimony, the State offered into evidence certified copies of each of Elmore's three prior convictions, including: a 1973 felony conviction from Grant County for first degree forgery, a 1976 felony conviction from Minnesota for burglary, and a 1977 felony conviction from Idaho for grand larceny.

Dr. Daniel Selove, Associate Medical Examiner for Whatcom County, also testified. Dr. Selove used photographic slides to explain the autopsy process and illustrate his findings. The autopsy corroborated Elmore's admission that he raped Kristy, choked her, inserted the nine-inch needle into her skull, and struck her head with a sledgehammer. Dr. Selove noted Kristy also suffered five additional blows to

the face, which appeared to be caused by a fist. Dr. Selove opined Kristy died from a combination of blunt trauma to the head, ligature strangulation, and the needle stab wound to the head. Test results from a swab of Kristy's vaginal area also indicated vaginal penetration had occurred. In Dr. Selove's opinion, Kristy was alive throughout the entire attack as Elmore strangled her, drove a needle into her brain, and bludgeoned her head with his fists and a hammer.

Joe Zane, an eighth grader at Kristy's school testified that, at about 8:10 A.M. on Monday, April 17, he saw Kristy in a van. He described the van and noted Kristy and the driver appeared to be arguing. Willie Golightly took the stand and described the backpack he found along Samish Way.

The remainder of the State's evidence was from law enforcement personnel. Officer Matsudaira recounted his contact with Golightly and Elmore while at Golightly's residence. The 911 operator who answered Elmore's call played a recording of the call for the jury. Officer Carr testified he contacted Elmore outside the Bellingham Police Station and invited him into the station. Lieutenant Sucee related his brief contact with Elmore before Detective Gitts arrived, explaining how he advised Elmore of his constitutional rights. Detective Richard Nolte offered the jury an extensive overview of the crime scene. The prosecutor offered photographs and demonstrative exhibits to illustrate Detective Nolte's narration.

Elmore then offered mitigating evidence for the jury to consider in determining his sentence. He subpoenaed three judges to testify. Two of the judges described Elmore's dejected demeanor during pretrial court appearances. They also commented on Elmore's willingness to plead guilty. A third judge testified Elmore was not allowed to plead guilty at the outset because of the 30-day time frame in which the State could elect to pursue the death penalty.

Elmore also called the Whatcom County Public Defender's Investigator, Michael Sparks, to the stand. Sparks introduced an album containing photographs of Elmore, a

map documenting Elmore's flight to Oregon, and a foam board inscribed with a written narration of Elmore's life. Sparks also offered biographical testimony. He explained Elmore grew up in Oregon with five siblings. His parents argued constantly and his father abused alcohol, making steady employment difficult. At one point, Elmore's parents separated, but quickly reunited for financial reasons. Elmore's father used a belt to punish the children.

Elmore dropped out of school in the 11th grade and joined the Army. He was discharged in 1972 after serving in Vietnam. Elmore worked briefly in Walla Walla as a maintenance man until he was arrested and convicted of first-degree forgery. Elmore moved to Minnesota and worked at a gas station. In 1976, he was convicted of burglary. Elmore returned to Washington in 1976 to work for a forklift company in Spokane. In 1977, Elmore was convicted in Idaho of grand larceny. He was released in 1979 and met Sue Ohnstad in Fargo, North Dakota, in 1985. After moving several times, they settled in Whatcom County. In 1991, their daughter Kayla was born.

The only other witness called during the defense portion of the penalty phase was Professor David Boerner. Professor Boerner testified none of Elmore's prior felony convictions constituted predicate strikes under the "Three Strikes You're Out" statute and would have "washed out" under the SRA.

After the defense rested, the trial court instructed the jury and both sides presented closing arguments. The jury was then asked to retire and deliberate upon the following question:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

Clerk's Papers at 177 (instruction 3). On March 12, 1996, the jury unanimously concluded there were not sufficient circumstances meriting leniency.

At a May 3, 1996 sentencing hearing, finding no credible evidence of mitigation that would bar the death penalty, the trial court sentenced Elmore to death. Following sentencing, the court denied Elmore's post-trial motion to vacate the verdict and to strike the penalty phase hearing. Elmore appealed his sentence directly to us. RCW 10.95.100; RAP 4.2(a)(6).

## ANALYSIS

A. The Information Gave Elmore Adequate Notice of the Charges Against Him

Elmore asserts the charging document is inadequate because it did not clearly inform him that the concealment aggravator referred to his prior molestation of Kristy. The information states in pertinent part:

AGGRAVATED MURDER IN THE FIRST DEGREE, COUNT I: That the defendant, CLARK RICHARD ELMORE AKA JAMES ELMORE AKA JAMES LEE DICKEY, then and there being in said county and state, on or about the 17th day of April, 1995, with premeditated intent to cause the death of another person, did choke, drive a metal needle-like object into the brain, and did strike numerous times in the head with a hammer KRISTY LYNN OHNSTAD, thereby causing the death of KRISTY LYNN OHNSTAD, a human being and the defendant committed the murder to conceal a commission of a crime or to protect or conceal the identity of the person committing a crime, and the murder was committed in the course of, furtherance of, and immediate flight from Rape in the Second Degree, in violation of RCW 10.95.020(7), (9)(b) and RCW 9A.32.030(1)(a), which violation is a Class A Felony;

Clerk's Papers at 838-39. Elmore also contends evidence regarding the prior molestation was "devastating to [his] defense" because "[t]he jury was from the beginning encouraged to believe that the threat to disclose the prior contact was the reason [he] committed the murder." Opening Br. of Appellant at 98-99.

The record does not support Elmore's assertion he did

not know concealment of the prior molestation was at issue. The prosecutor made essentially the same fact statement at the April 24, 1997 probable cause hearing as he did at the July 6, 1995 plea hearing, noting Elmore had confessed to molesting Kristy when she was five years old, and that Kristy had threatened Elmore a number of times with disclosure. He thought of killing her on other occasions when she threatened to disclose his abuse. When he drove her to school that Monday morning they had a heated argument and he decided not to take her to school.

Furthermore, Elmore's complaint about the devastating effect of evidence relating to the prior molestation is inconsistent with the fact the Statement of the Case, about which he now complains, was an "agreed statement." *See* 4 Report of Proceedings at 440. Elmore's defense team helped compose the agreed statement, which concluded "Mr. Elmore said in his confession that the threat of disclosure cost Kristy Ohnstad her life." *Id.* at 441-42.

Moreover, while a charging document must contain all statutory and nonstatutory elements, *State v. Kjorsvik*, 117 Wn.2d 93, 97, 812 P.2d 86 (1991), the particular crime a defendant commits murder to conceal is not an element the State must plead and prove in charging a defendant with aggravated first degree murder. In *State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722, *cert. denied*, 479 U.S. 922, 107 S. Ct. 328, 93 L. Ed. 2d 301 (1986), we held due process did not require a specific underlying crime be charged under former RCW 10.95.020(7).

> [Former] RCW 10.95.020(7) specifically requires that "the person committed the murder to conceal the commission of *a crime* or to protect or conceal the identity of any person committing *a crime*." The specific crime need not be stated, as the statute did not require it. It is true that the process requires proof beyond a reasonable doubt that the defendant committed the murders to conceal his identification as the person committing *a crime*. Due process, however, does not require that the specific crime be charged and included in the jury instructions.

*Id.* at 419-20 (emphasis in original). Similarly, regarding

the same aggravator, we said in *State v. Gentry*, 125 Wn.2d 570, 602-03, 888 P.2d 1105, *cert. denied*, 516 U.S. 843, 116 S. Ct. 131, 133 L. Ed. 2d 79 (1995):

> the predicate crime need not be identified by the jury. Here the underlying crime was not specifically identified. However, it was clear that under the evidence presented, the jury could well have found the underlying crime was sexual assault or attempted sexual assault.

(Footnotes omitted.) *See also State v. Pollnow*, 69 Wn. App. 160, 163-64, 848 P.2d 1265, *review denied*, 121 Wn.2d 1030, 856 P.2d 382 (1993).

The information in this case was legally sufficient because it set forth the required elements of aggravated first-degree murder. It clearly states "the defendant committed the murder to conceal . . . the identity of the person committing a crime[.]" Clerk's Papers at 839. Moreover, as in *Gentry*, based on the evidence presented, the jury could reasonably have found the underlying crime to be Elmore's prior sexual assault of Kristy. There is no error in the information here.

## B. Elmore's Guilty Plea Was Valid

Elmore argues he was not advised of the constitutional rights he would forfeit or the direct sentencing consequences that would result from a guilty plea at the time he pleaded guilty; thus, his plea is invalid because it was not knowingly and intelligently made. He additionally asserts when the trial court accepted his plea at the July 6, 1995 hearing, the State presented no factual basis to establish he killed Kristy to conceal the prior molestation or to protect or conceal the identity of the person who committed the prior molestation.

Elmore asserts his guilty plea to aggravated murder was not knowingly and intelligently made under *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), *superseded by statute on other grounds as stated in United States v. Gomez/Cuevas*, 917 F.2d 1521 (10th Cir. 1990).

*Boykin* identified reversible error in a trial court's *acceptance* of a guilty plea without having created a record that affirmatively showed the plea to be knowing and voluntary. *Id.* at 242; *United States v. Mulloy*, 3 F.3d 1337, 1339 (9th Cir. 1993). Such record must show that in pleading guilty, the defendant understood he was giving up three important constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. *Boykin*, 395 U.S. at 243; *Parke v. Raley*, 506 U.S. 20, 29, 113 S. Ct. 517, 523, 121 L. Ed. 2d 391 (1992).

Contrary to Elmore's assertions, the record here clearly shows that *before accepting* Elmore's pleas at the July 6, 1995 hearing, the trial court, in a thorough colloquy on the record, explained these rights and others Elmore would forfeit by pleading guilty. Elmore was adamant about pleading guilty from the start, as his actions at the first appearance hearing indicated. A fair reading of the record shows that although Elmore was arraigned on June 29, 1995, and initial pleas were entered for arraignment purposes, the trial court did not accept those pleas until his rights and the consequences of such pleas were thoroughly explained to him on July 6. At the July 6 hearing, upon explaining each right that would be forfeited, the judge asked Elmore if he understood and Elmore acknowledged he did. Elmore's trial attorney also verified to the court the validity of Elmore's pleas. When asked, Elmore's attorney attested to Elmore's mental competence and stated:

> I might indicate to Your Honor as well that we reviewed the [Statement of Defendant on Plea of Guilty] in its entirety with Mr. Elmore prior to coming to court this morning. I'm convinced that it's a voluntary plea on Mr. Elmore's behalf.
>
> . . . .
>
> Mr. Elmore wishes to admit; I'm convinced that he did the crimes. I'm convinced that with full knowledge of the consequences he wishes to admit his guilt here today, that it's a knowing, voluntary and intelligent plea.

Hearing (July 6, 1995) at 28-29.

Moreover, the trial court questioned Elmore regarding his CrR 4.2(g) Statement of Defendant on Plea of Guilty. The record shows the direct sentencing consequences of his guilty plea were explained to and accepted by Elmore. Hearing (July 6, 1995) at 15-16, 26. Only at the conclusion of the hearing, after this lengthy colloquy, did the trial court finally accept Elmore's pleas and enter findings. *Id.* at 29.[1] Elmore's guilty pleas were valid. *State v. Branch*, 129 Wn.2d 635, 642 n.2, 919 P.2d 1228 (1996) (presumption of voluntariness regarding signed plea statement is "well nigh irrefutable" where defendant acknowledged reading, understanding the truth of plea statement he signed, and judge takes further step of colloquy on record to verify voluntariness).

■ Elmore also asserts he did not receive adequate notice of the charges against him at the July 6, 1995 plea hearing, arguing the factual basis for his guilty plea for aggravated murder was not sufficiently developed on the record. The prosecutor's statement, acknowledged by the defendant, may provide the necessary factual basis for a guilty plea. *State v. Osborne*, 102 Wn.2d 87, 95, 684 P.2d 683 (1984) (factual basis for defendant's guilty plea may be any reliable source of information, including prosecutor's factual statement, so long as such source is made part of the record); *In re Personal Restraint of Keene*, 95 Wn.2d 203, 210, 622 P.2d 360 (1980) (factual basis of plea must be developed on the record at the time the plea is taken). Just prior to describing Kristy's rape and murder, the prosecutor read this statement:

He [Elmore] indicated that he molested Kristy when she

---

[1] In closing argument, Elmore's attorney acknowledged Elmore was properly advised of his rights.

And we know again that Judge Mura asked, because he ultimately accepted the guilty plea, and we know that Judge Mura went through his rights with him again, again to make sure, and as the testimony indicated from the stand he was satisfied, Judge Mura was satisfied the Clark Elmore knew exactly what he was doing, that it was a knowing and a voluntary acceptance of responsibility[.]

17 Report of Proceedings at 2629.

was about five years old. She had threatened him many times with disclosing this. He indicated that he thought of killing her on other occasions when she had threatened to disclose the abuse.

He stated that he drove her to school Monday morning, April 17th, but didn't really intend to take her there. He became angry with her as they were driving towards the school. He told her to shut up and drove to Nulle Road, parked on an undeveloped dirt roadway. He told Kristy to do as he said or she would get seriously hurt. He took her in the back of the van, told her to take her clothing off. When she didn't comply, he took her pants and panties and lifted up her shirt and bra. He indicated that Kristy was crying and was trying to talk her way out of this. She reminded him that he promised that he would never do this again.

Hearing (July 6, 1995) at 21-22. While the prosecutor could have made clearer in his statement of facts that, as Elmore confessed, the threat of disclosure of the prior molestation served in part as a catalyst for the murder, a jury hearing the prosecutor's statement could have concluded as much. *State v. Saas*, 118 Wn.2d 37, 43, 820 P.2d 505 (1991) ("In determining whether a factual basis exists for a plea, the trial court need not be convinced beyond a reasonable doubt that the defendant is in fact guilty. . . . Rather, a factual basis exists if there is sufficient evidence for a jury to conclude that the defendant is guilty."); *State v. Newton*, 87 Wn.2d 363, 370, 552 P.2d 682 (1976). Based on the evidence presented, a jury could rationally find beyond a reasonable doubt that Elmore, tired of Kristy's constant threats of disclosure, succumbed to one of his many "thoughts of killing her." *Cf. State v. Norval*, 35 Wn. App. 775, 782-83, 669 P.2d 1264 (1983) (on the evidence presented, jury could rationally find beyond a reasonable doubt defendant intended to assault the victim).[2]

---

[2]Even if the prosecutor's statement did not provide a sufficient factual basis to sustain Elmore's guilty plea as to the concealment aggravator, such finding would not result in a reversal of Elmore's death sentence. Concealment was only one of two aggravating factors determined by the jury to apply to Elmore's case. The

### C. Elmore's Appearance in Shackles on the First Day of Voir Dire Does Not Require Reversal

Elmore contends his constitutional rights were violated because he appeared before the jury panel on the first day of voir dire in shackles. However, the record clearly indicates the trial judge did not order Elmore to be shackled, but allowed him to so appear on only the first day of jury selection believing this to be the carefully considered desire of Elmore's defense counsel. Elmore was shackled for transportation to the judge's chambers for a hearing on his request to appear in jail greens at sentencing. Defense counsel, and Elmore himself, indicated on the record Elmore's desire to appear in jail greens rather than street clothes. The prosecutor asked the transportation officer whether the shackles would come off before Elmore went into the jury room; to which the transportation officer replied:

> It is anticipated as of now that if I would have known we would have met the jury I would have had the stun belt on him where it wouldn't have shown. I was told we were not going to be in front of the jury today.

Defense counsel then volunteered as follows:

> We don't have an objection as it is now. What I've told the transportation officers that as far as security I think it appropriate to leave that to the jail. I think realistically we're dealing with a situation where Mr. Elmore has pled guilty and, frankly, I think the jurors would expect him at this point to be in custody and I would just leave it at that and defer to the court to see if there's anything else that the court feels should be of record at this point.

To which the court responded:

> Your big concern normally is the presumption of innocence

---

other aggravating factor, murder in the course or furtherance of, or flight from rape in the second degree (former RCW 10.95.020(9)(b) (1994)), is not disputed. As only one aggravating factor is needed for imposition of the death penalty, *State v. Brown*, 132 Wn.2d 529, 558, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007, 118 S. Ct. 1192, 140 L. Ed. 2d 322 (1998), Elmore's sentence is sustainable under either determination.

and we don't have this here. The court knows of no indepen-
dent comment it wishes to make at this point. I think as long
as the decision has been carefully thought through for what-
ever reasons, if the defense team wants to do that, that's fine.

4 Report of Proceedings, at 426-28.

■ We are fully aware shackling an accused imperils
that person's constitutional right to a fair trial by revers-
ing the presumption of innocence. *State v. Hutchinson*, 135
Wn.2d 863, 887-88, 959 P.2d 1061 (1998), *cert. denied*, 525
U.S. 1157 (1999). We reiterate here again that trial courts
must be scrupulous in their observation of this concern,
but we afford trial courts discretion in addressing on a
case-by-case basis whether a defendant should be restrained
during trial. *Id.*; *see also State v. Breedlove*, 79 Wn. App.
101, 113-14, 900 P.2d 586 (1995). Trial courts must weigh
on the record the reasons for restraining an accused in the
courtroom, recognizing the accused's right to due process
as we noted in *State v. Hartzog*, 96 Wn.2d 383, 400, 635
P.2d 694 (1981). The trial court did not undertake such an
analysis here in light of defense counsel's consent to
shackling Elmore.

Our admonition to trial courts, however, does not relieve
defense counsel of the obligation to object or request a
curative instruction regarding shackling. In *Wilson v. Mc-
Carthy*, 770 F.2d 1482, 1485-86 (9th Cir. 1985), the Ninth
Circuit rejected a shackling challenge, holding "[w]hen the
jury's view of a defendant or witness in shackles is brief
. . . or inadvertent, the defendant must make an affirma-
tive showing of prejudice." That court also placed the
burden for curing any defect on the defendant.

> Although no instruction was requested, the better course may
> have been for the trial court *sua sponte* to give an instruction
> concerning the shackles. . . . Nevertheless, we decline to
> impose upon the trial court the mandatory responsibility of
> giving such an instruction when the defendant fails to request
> one. The choice whether such an instruction should be given
> should ordinarily lie with the defendant. . . .

. . . .

. . . Ultimately, . . . it is incumbent upon the defendant to show that less drastic alternatives [to shackling] were available and that the trial judge abused his discretion by not implementing them.

*Id.* at 1485-86. *Accord State v. Gosser,* 33 Wn. App. 428, 436, 656 P.2d 514 (1982) (noting where defendant failed to request curative instruction regarding shackling incident, trial court's denial of defendant's motion for a new trial based on alleged prejudice therefrom was proper).

A claim of unconstitutional shackling is subject to a harmless error analysis. *See State v. Finch,* 137 Wn.2d 792, 975 P.2d 967, 999-1003 (1999) (analyzing the determinative factors in a court's decision to restrain a defendant during trial). In order to succeed on such claim, a defendant must show prejudice, that is, "a substantial or injurious effect or influence on the jury's verdict." *Hutchinson,* 135 Wn.2d at 888. *Accord State v. Early,* 70 Wn. App. 452, 462, 853 P.2d 964 (1993) (defendant's mere appearance in handcuffs during jury selection does not indicate the incident "inflamed or prejudiced" the jurors against him), *review denied,* 123 Wn.2d 1004, 868 P.2d 872 (1994). *See also Gosser,* 33 Wn. App. at 435 (it is not reversible error simply because jurors see a defendant wearing shackles).

In the present case, the appearance of Elmore in shackles on the first day of voir dire, though error, was harmless. Defense counsel and Elmore himself agreed he was to appear before the jury throughout the case in jail greens, presumably as part of his trial strategy to acknowledge his culpability and to express his assumption of responsibility for his crime. Defense counsel, despite the State's concern expressed on the record, agreed to Elmore's shackling on the first day of voir dire. Ultimately, the prospective jury knew Elmore pleaded guilty to aggravated murder in the first degree, he appeared throughout the selection of the jury in jail garb, and he was shackled on only the first day of jury selection, which took two weeks, and never was shackled during the ensuing penalty phase of trial. Elmore has failed to establish prejudice.

The case upon which Elmore primarily relies, *Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995), *cert. denied*, 517 U.S. 1158, 116 S. Ct. 1549, 134 L. Ed. 2d 651 (1996), is distinguishable. There, the United States Court of Appeals for the Ninth Circuit held "Duckett's constitutional rights were violated when the state trial court required him to appear in shackles before the jury at his [capital case] sentencing hearing." *Id.* at 749. The Ninth Circuit faulted the state trial court for *summarily overruling Duckett's objection* to the shackles and *imposing* the use of restraints without stating its reasons for doing so; noting "[i]n this circuit it is a denial of due process if a trial court *orders* a defendant shackled without first engaging in a two-step process." *Id.* at 748 (emphasis added). Unlike the *Duckett* case,[3] the trial court here did not *order* Elmore shackled during sentencing. Instead, Elmore's shackling was self-imposed.

■ Finally, Elmore claims his appearance on the first day of voir dire in shackles amounted to an impermissible judicial comment on the evidence in violation of Washington Constitution, article IV, section 16, asserting "[i]n this instance, Judge Nichols communicated to the venire his belief that Mr. Elmore was such a dangerous person that he had to be shackled in the courtroom." Opening Br. of Appellant at 85.[4] This assertion is meritless.

Article IV, section 16 of our Constitution provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." The purpose of article IV, section 16 is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted. *State v.*

---

[3]Similarly, in *Finch*, the trial judge *ordered* the defendant shackled during the entire course of his trial and special sentencing proceeding. *Finch*, 137 Wn.2d at 850. On appeal, we held the trial court's decision was error because Finch allegedly was never disruptive in court, he was not an escape risk, and he posed no threat to the court. *Id.* However, the distinguishing factor between these two cases is that neither the defendant nor his attorney requested the shackling. *Id.*

[4]It could be argued the removal of shackles after the first day of jury selection support Elmore's assertion on appeal that he was not violent.

*Lord,* 117 Wn.2d 829, 862, 822 P.2d 177 (1991), *cert. denied,* 506 U.S. 856, 113 S. Ct. 164, 121 L. Ed. 2d 112 (1992), *overturned on other grounds,* 184 F.3d 1083 (9th Cir. 1999). *See also State v. Carothers,* 84 Wn.2d 256, 267, 525 P.2d 731 (1974) ("To constitute a comment on the evidence, it must appear that the court's attitude toward the merits of the cause are reasonably inferable from the nature or manner of the court's statements."); *City of Seattle v. Arensmeyer,* 6 Wn. App. 116, 120, 491 P.2d 1305 (1971) (trial court's interruption of counsel during closing argument to say he was mistaken as to the evidence was an unconstitutional comment on the evidence).

Here, the trial court made no actual comment or statement regarding the shackles, but permitted Elmore to appear in shackles the first day of voir dire. Any possible misinterpretation by the jury that Elmore's shackled appearance amounted to a comment on the evidence by the judge was averted by the admonishment included in instruction 1:

> The law does not permit me to comment on the evidence in any way. A judge comments on the evidence if the judge indicates, by words or conduct, a personal opinion as to the weight or believability of the testimony of a witness or of other evidence. Although I have not intentionally done so, if it appears to you that I have made a comment during this hearing or in giving these instructions, you must disregard the apparent comment entirely.

Clerk's Papers at 174-75. If any defect existed, this admonishment cured it. Moreover, Elmore offers no support for his contention of improper comment or influence. In *Lord,* we rejected the defendant's contention the trial court impermissibly commented on evidence by allowing a chart submitted by the State to be taken into the jury room and that such act subtly supported the State's theory and credibility of the State's witnesses. In rejecting the defendant's contention, we noted "Lord does not support his accusation of subtle influence with a single reference to the record." *Lord,* 117 Wn.2d at 863. Nor does Elmore.

Elmore voluntarily chose to appear at the pretrial hearing in shackles. He cannot now claim his considered strategic decision to do so violated his right to a reliable sentencing hearing. Nor does the record indicate his initial appearance in shackles at the beginning of voir dire "inflamed or prejudiced" the jury finally impaneled some two weeks later or that his appearance constituted an impermissible judicial comment on the evidence. Elmore's challenge to his sentence, based on his assertions regarding shackling, is meritless.[5]

D. Elmore's Assertions of Improprieties During Voir Dire Do Not Merit Reversal of His Sentence

 1. Elmore's Challenge to the State's Questioning of Jurors Is Not Properly Raised

Elmore asserts the prosecutor's questions to potential jurors during voir dire were improper thus denying his right to due process and reliable sentencing. We decline to address this issue because it is not properly raised.

As a threshold matter, Elmore failed to raise any objection in the trial court about the State's voir dire questioning of potential jurors. *See State v. Tharp*, 42 Wn.2d 494, 501, 256 P.2d 482 (1953) (selection of the jury is procedural and error regarding same not timely raised to trial court bars its consideration on appeal); *Gentry*, 125 Wn.2d at 615-16 (voir dire involves compliance with procedural court rule rather than constitutional issue and challenge regarding same may not be raised for first time in capital appeal).

Furthermore, Elmore accepted the jury as constituted and did not exhaust his peremptory challenges. He therefore cannot show any prejudice based on the jury's composition. *Tharp*, 42 Wn.2d at 500 (defendant must show the use of all his peremptory challenges or he can show no prejudice arising from the selection and retention of a par-

---

[5]Resolution of the shackling issue on the above-described grounds, makes it unnecessary to address the State's argument that any error as to shackling was invited by the defense. We do note, however, that the invited error doctrine does indeed apply to capital cases. *See Gentry*, 125 Wn.2d at 646.

ticular juror and is barred from any claim of error in this regard); *State v. Collins*, 50 Wn.2d 740, 744, 314 P.2d 660 (1957) (no prejudicial error regarding prosecutor's questioning of panel where defendant accepted the jury while having available four peremptory challenges; nor did he challenge the panel); *Gentry*, 125 Wn.2d at 616 (where defendant participated in selecting and ultimately accepted jury panel, his constitutional right to an impartial jury selected by him was not violated). As we said in *State v. Williams*, 96 Wn.2d 215, 634 P.2d 868 (1981), a claimed irregularity did not result in an unfair trial where the defendant failed to timely assert such irregularity.

> [P]etitioner declined to move for a mistrial when a sick juror was excused. It is obvious the defense did not feel greatly prejudiced by the late revelation of the incident until after the adverse verdict. The defense made a tactical decision to proceed, "gambled on the verdict," lost, and thereafter asserted the previously available ground as reason for a new trial. This is impermissible.

*Id.* at 226 (citations omitted). We decline to address Elmore's assertions that the State asked improper questions of jurors when he failed to object to such questions in the trial court and accepted the jury as empanelled.

2. Dismissal of Juror 21 Was Proper

 In his pro se brief, Elmore asserts error regarding the dismissal of juror 21. Because Elmore objected to the State's for-cause challenge to juror 21 during voir dire, we will address this assertion of error.

The State challenged juror 21 for cause and the trial court dismissed her because her responses to questions, from both the prosecutor and defense counsel, indicated her religious convictions would not allow her to impose the death penalty. *See* 7 Report of Proceedings at 1111, 1113.[6] The record indicates juror 21's religious convictions foreclosed her consideration of the death penalty. Under such

---

[6]The prosecutor queried juror 21 in part as follows:

Prosecutor: . . . [I]f you believe that the state has proven beyond a reasonable

circumstances, her dismissal was proper. *State v. Brett*, 126 Wn.2d 136, 157, 892 P.2d 29 (1995) (juror may be excused for cause if his views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath), *cert. denied*, 516 U.S. 1121, 116 S. Ct. 931, 133 L. Ed. 2d 858 (1996); *Gentry*, 125 Wn.2d at 634-36 (trial court's dismissal of prospective juror in capital case will not be reversed on appeal absent a manifest abuse of discretion); *State v. Mak*, 105 Wn.2d 692, 705-08, 718 P.2d 407, *cert. denied*, 479 U.S. 995, 107 S. Ct. 599, 93 L. Ed. 2d 599 (1986), *sentence vacated on writ of habeas corpus on other grounds sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 507 U.S. 951, 113 S. Ct. 1363, 122 L. Ed. 2d 742 (1993) (prospective juror who stated that she could not impose death penalty due to a religious belief demonstrated actual bias against death penalty, and was properly removed for cause).

---

doubt that the death penalty is the appropriate penalty would your religious and moral views prevent you or substantially impair you from voting for the—

Juror 21: For the death penalty?

Prosecutor: Yes.

Juror 21: I think so, yes.

7 Report of Proceeding at 1111. Defense counsel then questioned juror 21 in part as follows:

Defense counsel: . . . [I]f you in your own mind thought that the death penalty was appropriate in a particular case, if you were to come to that decision, are you, nonetheless, concerned that you might not be able to return that verdict because despite coming to, to that decision in your own mind you may have some religious belief that would override?

Juror 21: Yes.

Defense Counsel: Okay, okay. So even if you were to think that the death penalty was appropriate, you're concerned you might not be able to apply it—

Juror 21: Right.

Defense Counsel: —because of your belief that you owe a higher allegiance to the Lord?

Juror 21: Right

7 Report of Proceedings at 1112-13.

## E. The Statement of the Case Read to the Venire Was Proper

■ Elmore asserts he was denied due process because the agreed statement of the case read to the panel at the beginning of voir dire misstated the evidence and constituted an impermissible judicial comment on the evidence. We disagree.

First, the defense proposed the statement of facts and its presentation to the venire at the beginning of voir dire. As Elmore proposed such presentation, assisted in its drafting, and agreed to its content, he cannot now be heard to complain the trial court did as he requested. In *Gentry*, we held:

> We will adhere to our normal use of the invited error doctrine, but will review any invited instructional error in connection with an ineffectiveness of counsel argument . . . .

*Gentry*, 125 Wn.2d at 646. *See also State v. Henderson*, 114 Wn.2d 867, 869-70, 792 P.2d 514 (1990) (an invited error will not be reviewed on appeal even if it meets the standard for review under RAP 2.5); *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984) (a party is prohibited from setting up an error at trial and then complaining of it on appeal), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 321, 893 P.2d 629 (1995); *State v. Boyer*, 91 Wn.2d 342, 345, 588 P.2d 1151 (1979) (party may not challenge on appeal an instruction which it proposed). Here, Elmore makes no assertion of ineffective assistance of counsel regarding this issue. Thus, under *Gentry*, consideration of such error, if any, is barred by the invited error doctrine.[7]

Moreover, the agreed statement did not misstate the evi-

---

[7]In *State v. Lewis*, 15 Wn. App. 172, 177, 548 P.2d 587, *review denied*, 87 Wn.2d 1005 (1976), the court stated:

when a defendant in the procedural setting of a criminal trial makes a tactical choice in pursuit of some real or hoped for advantage, he may not later urge his own action as a ground for reversing his conviction even though he may have acted to deprive himself of some constitutional right. A criminal defendant is entitled to a fair trial *from the state*, including due process. He is not

dence, but was a faithful summation of Elmore's rambling confession. Elmore now claims two phrases contained in the agreed statement are inaccurate: "He [Elmore] forcibly removed her clothing[,]" 4 Report of Proceedings at 441, and the last sentence which reads "Mr. Elmore said in his confession that the threat of disclosure cost Kristy Ohnstad her life." 4 Report of Proceedings at 441-42.

Regarding the first statement, the record shows Kristy was not cooperative and Elmore forced himself on her. Elmore admits he raped, choked, and killed his stepdaughter. The events he described in his confession do not indicate a willing victim. He confessed he pulled her to the back of his van by the shirt, and told her to take off her clothes or she was going to get hurt. She did not, so Elmore "took her clothes off[.]" Clerk's Papers at 215. She was "[c]rying, trying to talk her way out of it." *Id.* When asked if she fought, Elmore replied, "She wasn't strong enough to fight me." Clerk's Papers at 216. The record supports the agreed statement that Elmore "forcibly removed her clothing."

The second asserted misstatement relates to questions and comments during Elmore's confession.

Elmore: Monday morning I woke her up, made her read the note, that her mother had left her. Took KAYLA to day-care. Come back and picked her up. Instead of taking her to school, I drove her out to south Lake Samish, where you found her. Choked her. Raped her. Killed her.

Detective: Is that something you planned on doing ahead of time, or is it, or did something cause it to happen?

Elmore: When she was about 5, I molested her. She's used that as a threat over my head. Many, many times. Every time she gets mad at me. I guess I just snapped and did it.

Detective: Did she use this threat over your head quite often?

Elmore: About every six months.

Detective: When was the last time? Did she threaten you that morning, she was going to turn you in?

denied due process *by the state* when such denial results from his own act, nor may the state be required to protect him from himself.

Elmore:　　No.

Detective:　When was the last time prior to that? Or the time just prior to this incident?

Elmore:　　Probably a week before.

Detective:　What led to those events, that she made that threat?

Elmore:　　Every time I try to discipline her, if she didn't like it. I wish she would've turned me in. Cost her her life. Trashed everybody around her. Trashed life [sic], SUE's life, KAYLA's life, my life.

Detective:　After the last threat, did the idea come in that you can't have this hanging over your head anymore, and if she does this, I'm not sure what I'm going to do? Or did you think, maybe, that you might kill her to . . . ?

Elmore:　　I, I just did it.

Detective: . Okay.

Elmore:　　The thought had been there before.

Detective:　Was it . . . . . when the thought was there before, did you, was there, at that time, a plan on how you would go about doing it, even though you didn't carry it out?

Elmore:　　I thought about doing it before. I never really laid any plans.

Detective:　Was it just . . . had you thought about it just one time before, or every so often when you really get angry?

Elmore:　　Just about every time I get threatened with it.

Clerk's Papers at 204-05. This colloquy indicates Elmore was tired of being threatened by his stepdaughter with disclosure of his prior molestation; he had frequently contemplated doing something about the problem, and he finally did. In saying the threat of disclosure cost the victim her life, the agreed statement accurately conveys the gist of Elmore's lamentation about the rationale for his actions. Elmore's complaints regarding the agreed statement of the

case or the circumstances of its presentation to the venire are groundless, particularly in light of his counsel's participation in its creation.[8]

### F. References to Elmore During Trial as "James Dickey" Did Not Deny Him a Fair Sentencing Hearing

Elmore asserts the trial court erred by allowing use of one of his aliases during trial. Reference to Elmore as James Dickey occurred in two contexts at trial. First, witnesses (and the prosecutor) referred to the defendant as James Dickey while giving testimony because that is how they knew him. During such testimony, the defense never objected to the use of such name. Because Elmore failed to object to such use of his alias at trial, he is barred from raising any objection here. *State v. Chase*, 59 Wn. App. 501, 508, 799 P.2d 272 (1990) (defendant waived any error in admitting his use of the alias because he made no objection at trial; error, if any, would have been due to a violation of ER 403 and 404(b); such error is not of constitutional magnitude and cannot be raised for the first time on appeal per RAP 2.5(a)).

Another instance of Elmore's being referred to as "Dickey" is in the transcript of his taped interview/confession. There, the defendant is identified as "James Dickey," the name he used previously with the Bellingham Police Department and indeed for 10 years prior to the events in this case. On motion of the defense, the transcript was redacted to omit reference to Elmore's other aliases. Defense counsel also requested the jury questionnaires and further pleadings omit the "aka's" from the caption. In doing so, defense counsel conceded it was proper to indicate to the jury James Dickey was "a name [Elmore] was known by[.]" 3 Report of Proceedings at 327. Elmore, after conceding the identification proper, cannot now be heard to complain that he was so identified.

---

[8]The agreed statement was not a judicial comment on the evidence where counsel prepared it and agreed to it. Any error associated with it was obviated by the giving of instruction 1 referenced above.

Further, evidence of an alias is not per se inadmissible; it must be relevant and material to prove issues in a case. *State v. Cartwright*, 76 Wn.2d 259, 264, 456 P.2d 340 (1969). In *Chase*, the Court of Appeals held evidence of an alias was properly used to link the defendant to the crime. 59 Wn. App. at 508. That is precisely the case here. Neither the prosecutor nor the State's witnesses used the term "alias" when referring to the defendant as James Dickey, and such name was referenced only in identifying the person who confessed to killing Kristy Ohnstad, that is, the defendant whose actual name is Clark Richard Elmore. *See also Cartwright*, 76 Wn.2d at 264 (witnesses' identification of accused under the name by which they knew him deemed proper). As reference to such name was necessary, its use was more probative than prejudicial under ER 403 and thus properly admitted by the trial court. *State v. Allen*, 57 Wn. App. 134, 143-44, 787 P.2d 566 (1990) (reviewing court determines whether trial court erroneously admitted evidence of defendant's alias under abuse of discretion standard). Elmore's assertions of error regarding reference to "James Dickey" are meritless.

G. The Admission of Autopsy Photographs Was Proper

Elmore claims the trial court erred in admitting autopsy slides, asserting they were irrelevant, cumulative, and highly prejudicial. During a pretrial hearing regarding the admission of such slides, the medical examiner who performed Kristy's autopsy described how each offered slide would assist him in explaining his testimony. The trial court weighed the admissibility of the slides with care and ultimately held the offered slides were not gruesome, each was more probative than prejudicial and together were not cumulative. The State originally offered 12 slides. Eight slides were ruled admissible, one of which was cropped.

The decision to admit photographic evidence lies within the sound discretion of the trial court. *Lord*, 117 Wn.2d at 870. Where the decision of the trial court is a matter of discretion, it will not be disturbed on review except on a

clear showing of abuse of discretion, that is, discretion manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971). In short, discretion is abused only where it can be said no reasonable man would take the view adopted by the trial court. *State v. Blight,* 89 Wn.2d 38, 41, 569 P.2d 1129 (1977).

Here, it cannot be said the trial court abused its discretion in admitting the autopsy photographs given the medical examiner's testimony that such slides would aid the jury in understanding his testimony. *See Lord,* 117 Wn.2d at 870-72; *State v. Pirtle,* 127 Wn.2d 628, 653-55, 676, 904 P.2d 245 (1995), *cert. denied,* 518 U.S. 1026, 116 S. Ct. 2568, 135 L. Ed. 2d 1084 (1996). The defense here obviously wants to sanitize the events of a brutal crime by dictating what evidence of the victim's death the State is entitled to present. "[A] bloody, brutal crime cannot be explained to a jury in a lily-white manner'." *Lord,* 117 Wn.2d at 871. Elmore has failed to show the trial court abused its discretion in the handling of the slides.

H. Evidence Regarding Elmore's Prior Molestation of the Victim Was Properly Admitted

 Elmore contends jury consideration of his statements about the prior molestation of Kristy was improper because "the evidence did not support the trial court's ruling that the prior acts were connected to the homicide[,]" and that such evidence is inflammatory. Opening Br. of Appellant at 132, 139. Elmore further contends the prior molestation was a separate bad act and had to be evaluated under ER 404(b). We disagree.

The record makes clear the prior molestation of Kristy Ohnstad was intricately linked to this crime. In Elmore's confession, he admits he molested Kristy when she was five years old and indeed links her threats of disclosure of that prior molestation to her killing. The prior molestation was part of the res gestae of this crime.

In *State v. Brown,* 132 Wn.2d 529, 570-71, 940 P.2d 546

(1997), *cert denied*, 523 U.S. 1007, 118 S. Ct. 1192, 140 L. Ed. 2d 322 (1998), we approved the admission of challenged evidence under the res gestae or "same transaction" exception to ER 404(b). There, we found the trial court did not abuse its discretion in admitting testimony regarding the defendant's subsequent sexual attack on another victim, holding such testimony "qualified as res gestae evidence because it provided the jury with a more complete picture of events surrounding the crimes committed against [the victim here]." *Id.* at 573. Likewise, evidence regarding Elmore's prior molestation of Kristy completes the picture here. *See also State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995).

The trial judge properly allowed evidence of Elmore's prior molestation of Kristy because Elmore confessed the threat of disclosure of the prior molestation served in part as a catalyst for the murder. In his confession, Elmore revealed Kristy did indeed mention the prior molestation the morning he killed her. He also indicated the constant threat of disclosure of the prior molestation played a role in her death. Elmore indicated on the morning of the homicide that he and Kristy had words on the way to school and the prior molestation came up again. Elmore then became angry and decided not to take Kristy to school.[9] When asked to describe the rape, Elmore noted that during the rape,

---

[9]Detective: She didn't make any threat about turning you in, on this particular day? About the deal with molesting her when she was five?

Elmore: Just before . . . we got in the van she was talking about it.

Detective: Oh, you're leaving the house, you're walking to the van?

Elmore: Yes.

Detective: What brought it up, that she wanted to say that?

Elmore: Probably because I told her she was grounded forever.

Detective: And that was for the not coming home the prior night, the Saturday deal?

Elmore: That and the shoplifting charge.

Detective: How did she say this threat? Did she say 'I'm going to turn you in', or do you recall what she said?

Kristy pleaded with him, reminding him that he promised not to do it again, referring to the prior molestation.[10] Because consideration of the prior molestation helped to "complete the picture" of the murder, its consideration by the jury was proper and necessary, as the trial judge ruled.

Elmore also argues *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984), specifically held evidence of uncharged crimes was not admissible in a death penalty proceeding. While we did hold portions of RCW 10.95.060(3) paragraph one unconstitutional in *Bartholomew*, we specifically upheld paragraph two of the same statute, stating:

> in the event that the sentencing jury is not the jury which convicted the defendant of aggravated first degree murder, the prosecution may in addition present evidence of the facts and circumstances of the murder, as provided by the second

---

Elmore: I don't remember the exact words now.

Detective: Was it that she was going to tell the police, or her mom, or . . . ?

Elmore: She's always threatening to turn me in.

Detective: Okay.

Elmore: She's even wrote letters, and then throwed them away.

Detective: I take it, you lost your temper when things started, you changed your mind from taking her to school?

Elmore: Yes.

Clerk's Papers at 209-10.

[10]Detective: [When the rape occurred] Was she saying or doing anything?

Elmore: Crying. Trying to talk her way out of it.

Detective: Do you remember what she was saying?

Elmore: She was telling me how awful it would be, and how I promised never to do it again.

Detective: She promised never to do it again?

Elmore: No, how I promised her that I would never do it again.

Detective: Oh, I see. Okay, referring back to the other, the molestation?

Elmore: Yes.

Clerk's Papers at 216.

paragraph of RCW 10.95.060(3).

*Bartholomew*, 101 Wn.2d at 643.[11]

Here, because Elmore pleaded guilty, the sentencing jury was not the jury that convicted him of aggravated first-degree murder. Thus, evidence regarding the "circumstances of the murder" could be properly presented to the sentencing jury in compliance with the second paragraph of RCW 10.95.060(3) and *Bartholomew*. *Gentry*, 125 Wn.2d at 643 (it is proper for the jury to consider the circumstances of the crime); *State v. Rice*, 110 Wn.2d 577, 607, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910, 109 S. Ct. 3200, 105 L. Ed. 2d 707 (1989). Because the prior molestation played a significant role in the "circumstances of the murder," its consideration by the jury was proper and necessary, as the trial judge ruled. Evidence regarding Elmore's prior molestation of Kristy was properly admitted.

I. The Trial Court Did Not Commit Error in Its Instructions

■■■ Elmore asserts the trial court erred in giving instructions 3 and 8 and in failing to give his proposed instruction 15. Elmore contends instruction 3[12] improperly limited the jury to considering only mitigating evidence

---

[11]RCW 10.95.060(3) states:

> The court shall admit any relevant evidence which it deems to have probative value regardless of its admissibility under the rules of evidence, including hearsay evidence and evidence of the defendant's previous criminal activity regardless of whether the defendant has been charged or convicted as a result of such activity. The defendant shall be accorded a fair opportunity to rebut or offer any hearsay evidence.

> In addition to evidence of whether or not there are sufficient mitigating circumstances to merit leniency, if the jury sitting in the special sentencing proceeding has not heard evidence of the aggravated first degree murder of which the defendant stands convicted, both the defense and prosecution may introduce evidence concerning the facts and circumstances of the murder.

[12]Instruction 3 (the statutory instruction question) states in pertinent part:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

Clerk's Papers at 177; RCW 10.95.060(4).

that directly related to the circumstances of the murder. We rejected this argument in numerous capital cases.[13] We do so again.

In *Gentry*, we stated constitutional requirements are met where the instructions as a whole allow the jury to consider relevant mitigating evidence:

> [T]he requirement of individualized determination required in capital cases is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime. This is what a capital jury in this state is to focus on and penalty phase jury instruction 4 [the statutory question instruction] was followed by instruction 5 which informed the jury that it was to consider as mitigating circumstances any other factors concerning the offense or the defendant that it found to be relevant. We conclude, as we have concluded repeatedly in the past, that RCW 10.95.060(4) is constitutional.

*Gentry*, 125 Wn.2d at 653 (citations omitted). As in *Gentry*, the instructions as a whole in Elmore's case allowed the jury to consider any relevant mitigating circumstances. Instruction 8 defines mitigating circumstance, notes the appropriateness of the exercise of mercy, lists nonexclusive factors the jury may consider, and concludes "[i]n addition to the factors listed above, *you are to consider any fact about Clark Elmore* or the offense that you deem to be a mitigating circumstance." Clerk's Papers at 182 (emphasis added). Elmore's contention that the jury was not allowed to consider the full scope of mitigating circumstances is without merit.

Elmore also asserts the term "significant" as used in instruction 8 is unconstitutionally vague. Instruction 8

---

[13]The language Elmore now challenges is substantively identical to his proposed instruction. *Cf.* Clerk's Papers at 286, 177. In *Gentry*, we also rejected defendant's challenge to the same "statutory question" instruction on substantive grounds, but noted, as here, "[d]efendant did not raise this issue below and in fact requested a substantially identical instruction. . . . [I]n the future the doctrine of invited error will be applied in capital cases[.]" *Gentry*, 125 Wn.2d at 652. Under *Gentry*, Elmore is procedurally barred from asserting on appeal an instructional error he invited.

uses language substantively identical to RCW 10.95.070(1) and states in pertinent part:

> You are to consider as mitigating circumstances any other factors concerning the offense or the defendant that you find to be relevant, including, but not limited to, the following:
>
> 1) Whether the defendant has or does not have a significant history of prior criminal convictions;

Clerk's Papers at 182. We rejected this same argument in *Pirtle*, holding such term not to be unconstitutionally vague and finding no constitutional infirmity in the instruction. 127 Wn.2d at 681. Elmore's challenge to these instructions is meritless.

Elmore also asserts the trial court erred in refusing his proposed instruction 15 which read:

> You are instructed that the following crimes, of which Clark Elmore was convicted, are not "most serious offenses," commonly known as "strikes," under the "3 Strikes, You're Out" law:
>
> 1) Forgery in the First Degree
>
> 2) Grand Larceny
>
> 3) Burglary

Clerk's Papers at 295. Elmore asserts the trial court should have given this instruction as it was an accurate reflection of the law and offered guidance to the jury in interpreting whether Elmore had a significant criminal history. Whether or not the instruction is an accurate statement of "three strikes" jurisprudence is irrelevant. Indeed, mixing SRA standards with the task before the jury under RCW 10.95 would tend more to confuse matters than provide helpful guidance. As we noted in *Brett*, 126 Wn.2d at 184, the SRA does not govern the sentencing of capital defendants.

> The SRA and RCW 10.95 serve two separate functions and are consistent. The SRA is a determinate sentencing system for felony offenders. It gives first degree aggravated murder a

seriousness score of 15 and provides for two possible sentences, life without parole or death. The statute, however, does not purport to govern or guide penalty phase juries in their sentencing decisions. This function is served by RCW 10.95, which guides and channels the jury's discretion in reaching an individualized sentencing decision for each defendant convicted of a capital offense.

*Id.* Because Elmore's status under the "three strikes" law is irrelevant to the issues before a capital case sentencing jury, and discussion of same could yield more confusion than enlightenment, the trial court did not abuse its discretion in refusing Elmore's proposed "three strikes" instruction.

## J. The SRA "Washout" Provisions Do Not Apply

Elmore asserts that the SRA washout provisions (RCW 9.94A.360(2)) and/or ER 403 balancing should be applied to strike his criminal history. He asserts not applying such provisions to capital case defendants violates equal protection. Elmore acknowledges we have previously rejected these arguments in *Brett*, 126 Wn.2d at 184; but, nevertheless urges us to abandon *Brett*. We recently reaffirmed *Brett*, however, in *State v. Stenson*, 132 Wn.2d 668, 744-46, 940 P.2d 1239 (1997) (declining to adopt SRA washout provisions or an ER 403 balancing requirement in death penalty cases, rejecting defendant's equal protection claim, and approving *Brett*), *cert. denied*, 523 U.S. 1008, 118 S. Ct. 1193, 140 L. Ed. 2d 323 (1998). We reaffirm our prior holdings in *Brett* and *Stenson*.

## K. The State's Closing Argument Did Not Deny Elmore a Reliable Sentencing Hearing

Elmore asserts misconduct by the State in closing argument in commenting on the "future dangerousness" provision of instruction 8, and by suggesting the 20-year indeterminate sentence Elmore received for a prior first degree forgery conviction be considered in determining whether Elmore had a "significant" criminal history.

The law applicable to prosecutorial misconduct is summarized in *Gentry*:

Where improper argument is charged, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments as well as their prejudicial effect. Reversal is not required if the error could have been obviated by a curative instruction which the defense did not request. The failure to object to a prosecuting attorney's improper remark constitutes a waiver of such error unless the remark is deemed to be so flagrant and ill intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.

125 Wn.2d at 640. *See also State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994) (remarks of the prosecutor, even if improper, are not grounds for reversal if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective), *cert. denied*, 514 U.S. 1129, 115 S. Ct. 2004, 131 L. Ed. 2d 1005 (1995); *Brown*, 132 Wn.2d at 561 (prosecuting attorney's allegedly improper remarks must be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury).

Here, Elmore neither objected to the comments he now characterizes as misconduct nor did he ask for a curative instruction or move for a mistrial. The prosecutor's misconduct must therefore meet *Gentry*'s "flagrant, intentional and incurable" test. The prosecutor's comments, while clearly advocacy, simply do not rise to such level.

Furthermore, the prosecutor's statements on future dangerousness were made in rebuttal as a response to a defense assertion in closing argument that the State had produced "zero, no evidence, none" on the issue of future dangerousness. 17 Report of Proceedings at 2636. No error was present in such a response. *Russell*, 125 Wn.2d at 86. Also regarding the issue of "significant criminal history," while advocating his viewpoint, the prosecutor also urged the jury to make their decision based on all the evidence,

17 Report of Proceedings at 2646, in compliance with *Brown*.[14] The State's comments were not sufficiently flagrant and did not produce such incurable prejudice as to amount to misconduct under *Gentry*.

L. No Prejudicial Error Was Present Where the Jury Played the Tape of Elmore's Confession During Deliberations

Elmore contends it was improper for the jury to replay his taped confession during deliberations. By agreement of counsel, the tapes of Elmore's April 23d confession were redacted to exclude certain portions, such as references to Elmore's James Dickey alias. Elmore's counsel, however, opposed the omission of a small portion of the redacted confession in which Elmore described his relationship with Kristy. The State and the defense thereafter agreed this passage, relevant to Elmore's remorse argument, could come in through the testimony of Detective Gitts.[15] The redacted confession was ultimately admitted as exhibit 18 and played to the jury. The State and Elmore's

---

[14]The trial court also gave a curative instruction:

> The attorneys' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. They are not evidence. Disregard any remark, statement or argument which is not supported by the evidence or the law as given to you by the court.

Clerk's Papers at 174 (instruction 1).

[15]On cross-examination of Detective Gitts, defense counsel Komorowski asked Detective Gitts to convey Elmore's response to Detective Gitts' inquiry about Elmore's relationship with Kristy. Detective Gitts testified as follows:

> My question to him was "And your relationship with KRISTY, and such, did you guys tolerate each other, like each other, absolutely hate each other, or you tolerate her, she hates you, or what sort of situation would you call that?" His response was "We barely tolerated each other." I responded "Okay." The defendant said "Which, again, is probably my fault. After all this was said and done, then I started to realize where I had made a lot of mistakes with KRISTY. 'Cause the only time I ever talked to KRISTY was to yell at her for something she didn't do that she was supposed to do. I didn't ever spend any time with KRISTY. Maybe this is because of the first time, I felt so guilty about it."

15 Report of Proceedings at 2392. This is the only language touching on Elmore's remorse that was redacted from the exhibit 18-confession tape heard by the jury.

counsel both referenced the taped confession and Detective Gitts' testimony in closing argument.

After oral argument, the bailiff assembled the exhibits, including the tape and tape recorder, in the presence of the prosecutor and both defense attorneys and helped carry them to the jury room.[16] The jury replayed the tapes in the jury room.[17] After the verdict, Elmore moved for a new sentencing hearing on May 3, 1996, claiming that, unbeknownst to his attorneys, the jury was allowed unsupervised access to a recording device. The trial court denied Elmore's motion.

We recently decided the case of *State v. Castellanos*, 132 Wn.2d 94, 935 P.2d 1353 (1997), which concerned the use of tape players by the jury. In *Castellanos*, we noted decisions regarding the admission of exhibits as evidence were within the sound discretion of the trial court and would not be disturbed on review absent a showing of abuse of discretion. *Id.* at 97. An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. *Id.* Noting that under CrR 6.15(e) the jury "shall take with it . . . all exhibits received in evidence" when it retires for deliberation, we held "exhibits taken to

---

[16]Declarations submitted by the parties present starkly contrasting versions of the knowledge of counsel regarding the tapes and tape player. The police officers' declarations presented by the State indicate defense counsel were fully aware of the tape player because one tape player, a "boom box," was substituted for Detective Gitts' own tape player. Declarations by defense counsel deny any knowledge of the tape player. The bailiff indicates the tapes and tape player were assembled in front of counsel with the other exhibits.

[17]Elmore presents declarations from jurors regarding their use of the tapes in deliberations. The trial court properly excluded such evidence as inhering in the verdict of the jury. *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651, 379 P.2d 918 (1962) (noting rule that a juror's testimony or affidavit is not receivable to impeach his own verdict, and that in a motion for a new trial supported by jurors' affidavits, if the facts alleged in such affidavit are linked to the juror's motive, intent, or belief, or describe their effect upon him; the statements cannot be considered in a motion for a new trial for they inhere in the verdict and impeach it); *Kiewit-Grice v. State*, 77 Wn. App. 867, 871, 895 P.2d 6 (noting the general rule is that jurors can attest only to facts which do not inhere in their verdict, that the individual or collective thought processes leading to a verdict inhere in the verdict, and where a juror's affidavit describes the considerations that led to the verdict, a court may not consider it), *review denied*, 127 Wn.2d 1018, 904 P.2d 299 (1995).

the jury room generally may be used by the jury as it sees fit." *Id.*

As Elmore argues here, the defendant in *Castellanos* contended the trial court's decision interfered with the fundamental guarantees associated with a jury trial, and unrestricted access to recordings during deliberations created a danger the jury would give undue emphasis to the tapes. *Id.* at 98. We specifically rejected such argument, noting:

> in *State v. Frazier,* 99 Wn.2d 180, 188, 661 P.2d 126 (1983), this court held "a tape recorded statement of the defendant and a properly authenticated transcript thereof may, within the sound discretion of the trial court, be admitted as exhibits and reviewed by the jury during its deliberations." At issue in *Frazier* was a tape recording of an oral statement the defendant had previously given the police. We stated "such exhibits [may] go to the jury if, in the sound discretion of the trial court, the exhibits are found to bear directly on the charge and are not unduly prejudicial." *Id.* at 189[, 661 P.2d 126].

*Id.* We held the rule in *State v. Frazier*, 99 Wn.2d 180, 661 P.2d 126 (1983), remains a workable method for lower courts to deal with such issues. We also held the correct test for prejudice under this analysis was not undue influence, but whether such evidence is likely to stimulate an emotional response rather than a rational decision. *Id.* at 100.

In *Castellanos*, we noted allowing the tapes with a playback machine to go to the jury is consistent with the law in most other states. *Id.* at 100-01 (citing with approval *Yung v. State*, 906 P.2d 1028, 1036 (Wyo. 1995) (defendant's tape-recorded confession a nontestimonial exhibit which the jury may review during deliberations)). *Id.* We found the trial court's decision to allow the jury unlimited access to the tapes with playback equipment was not an abuse of discretion:

> The fact the jury had unlimited access to the recordings and could play them at its whim does not prove it gave undue prominence to the exhibit. The playback machine allowed the

jury to utilize the tapes as any other exhibit.

*Castellanos*, 132 Wn.2d at 102.[18]

*Castellanos* essentially reiterated our holding in *Frazier* and the policy regarding jury use of exhibits articulated in CrR 6.15(e). To reiterate, a party seeking the admission of a nontestimonial exhibit must appropriately seek a ruling from the trial court on the admission of such an exhibit. Any objection to the exhibit's admission or its use by the trier of fact must be articulated at that time for a ruling by the trial court. However, once admitted into evidence, an exhibit may be used by the trier of fact in whatever fashion it chooses under CrR 6.15(e).

In the present case, the tapes of Elmore's April 23d confession (ex. 18) and his April 21st interview (ex. 13), both nontestimonial exhibits, were admitted into evidence by the trial court upon agreement of the parties. The jury was entitled to use these exhibits as it saw fit with the appropriate technical means to do so, i.e., a tape player. Otherwise, "[w]ithholding the playback machine would be like admitting a written contract into evidence but denying jurors their eyeglasses necessary to read it." *Castellanos*, 132 Wn.2d at 102.

Even if there were error in the trial court's failure to make a specific ruling on the use of these exhibits at the time of their admission, any error was harmless. First, as in *Castellanos*, there is no indication here the content of the tapes caused such an emotional response in the jury as to overpower reason.[19] Likewise, the tapes were relevant to

---

[18]The dissent's position here that "[t]he decision to deliver a tape playback machine to the jury room is critically important because it allows special emphasis to be placed on the taped evidence by unlimited repetition," Dissent at 313, clearly contradicts our previously stated position in *Castellanos* that a jury's repeated playing of a taped exhibit does not prove the jury placed undue importance on the exhibit. *Castellanos*, 132 Wn.2d at 102.

[19]The dissent accuses the majority of weighing and usurping "the function of the jury . . . [.]" Dissent at 319. But the dissent proceeds to do what it accuses the majority of doing. The "evidence of remorse," the absence of which the dissent laments, was presented to the jury, by stipulation of counsel, through the testimony of Detective Gitts. The jury apparently did not find such evidence sufficient grounds to merit leniency. Notwithstanding the dissent's dislike of this decision, the jury had the evidence and it made its decision based on that evidence.

the jury's inquiry. As the trial court noted, the recording of Elmore's lengthy confession was essentially the case for both sides because it both described the crime and reflected Elmore's decision to come back and take responsibility. Hearing (May 3, 1996) at 25-26 (". . . this can hardly be said to be a piece of evidence which was small in comparison to the rest of the case and, therefore, susceptible to being overemphasized." *Id.* at 25).

Moreover, the evidence of remorse present in that portion of the tape redacted from exhibit 18 (Elmore's taped confession) came into evidence through the testimony of Detective Gitts, as previously stipulated by the parties. Elmore could argue his theory of remorse to the jury from this testimony, other unredacted portions of his taped confession,[20] and the other evidence he presented at trial. Indeed, he did so. In closing argument, Elmore's attorney urged that Elmore's acceptance of responsibility and remorse were two powerful mitigating factors that the jury must consider. Elmore's attorney then reviewed the evidence presented, which showed Elmore felt remorse for Kristy's murder and accepted full responsibility without excuse. Some of this evidence included Elmore's voluntary return after fleeing to Oregon, turning himself in to the Bellingham Police, and providing a complete confession, all of which appear on the tape. Elmore's counsel emphasized the testimony of Lieutenant Sucee the officer to whom Elmore surrendered at the Bellingham Police Department, which described Elmore as "visibly remorseful." Again, Elmore's attorney read into the record Detective Gitts' testimony regarding Elmore's description of his relationship with Kristy and the regrets Elmore expressed. Elmore's attorney further noted the testimony of a court commissioner and two judges describing Elmore's de-

---

[20]Evidence of Elmore's remorse on the tape replayed by the jury included his regret that Kristy had not turned him in for the prior molestation; his disbelief at what he had done when walking back to his van after concealing Kristy's body; the fact that he was unable to eat after he fled to Oregon; and a lengthy description of events in Oregon leading to his return to Bellingham to surrender himself, prompted by seeing a little girl playing in a park.

meanor as dejected and Elmore's consistent desire at all stages of his case to plead guilty. Elmore was not denied an opportunity to argue his theory of the case to the jury. The jury simply found his position wanting in light of the total evidence before it. The jury's review of taped exhibits during deliberations was proper. CrR 6.15(e).[21]

M. The Presence of Alternate Jurors in the Jury Room Prior to the Reading of the Verdict Did Not Constitute Prejudicial Error

 Elmore asserts prejudicial error occurred when alternate jurors were admitted into the jury room prior to the reading of the verdict, relying on *State v. Cuzick*, 85 Wn.2d 146, 530 P.2d 288 (1975). He asserts "the presence of the alternate jurors immediately before verdict resulted in essentially unquantifiable error infecting the entire decision making process." Opening Br. of Appellant at 172. *Cuzick*, however, is distinguishable. In that case, we found the presence of an alternate juror in the jury room during deliberations invalidated the verdict because the presence of an outsider during deliberations "violates the cardinal requirement that juries must *deliberate* in private." *Cuzick*, 85 Wn.2d at 149 (emphasis added). We stated:

> we adhere to those cases which hold that prejudice will be presumed to flow from a substantial intrusion of an unauthorized person into the jury room unless "it affirmatively appears that there was not, and could not have been, any prejudice." Where, as here, the intrusion involves the visible presence of a nonjuror for the full length of deliberations, the presumption of prejudice clearly has not been so conclusively defeated.

*Id.* at 150 (citations omitted). Central to our holding in

---

[21]As Elmore's counsel noted in closing argument, referring to another exhibit,

And like all the exhibits you will have an opportunity to take this back in the jury room and just like the instructions all the exhibits are important. I'll be referring to some of them, but all the exhibits are important.

*Cuzick* was the *presence* of an unauthorized person in the jury room *during deliberations*. That is simply not the case here.

While alternate jurors were in the jury room prior to announcement of the verdict, it was only to line up and file in with the jury when court was reconvened to take the verdict. The record indicates the alternate jurors were not in the jury room during deliberations. The trial court excused the alternate jurors when the panel retired to the jury room to deliberate. After the jury reached its verdict, the alternate jurors were summoned from home by the bailiff to be present at the reading of the verdict and joined the jury while lining up to go into the courtroom. When questioned by the trial judge,[22] the Presiding Juror confirmed there was no discussion with alternates. Juror 1 noted the alternates did not know the jury's decision. The bailiff also affirmed the alternates arrived just prior to the jury's filing into the courtroom. The alternates were not present during deliberations and upon their arrival were not informed of the jury's verdict prior to its announcement in open court.

As no unauthorized person was present in the jury room

---

[22]Elmore argues his right to presence was violated because he did not attend the postverdict in camera "debriefing" of the jury. Both sides were excluded from this session. At the request of the prosecutor, the trial court questioned jurors on the record. Neither side objected to this procedure or to their exclusion from the in camera session. *See* 17 Report of Proceedings at 2652-56. In the first place, Elmore had no constitutional right to be present at the court's in camera "debriefing" of the jury after the verdict had been read. *See, e.g., In re Personal Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835, *clarified on other issues*, 123 Wn.2d 737, 870 P.2d 964, *cert. denied*, 513 U.S. 849, 115 S. Ct. 146, 130 L. Ed. 2d 86 (1994), in which we held a criminal defendant had no right to be present at conferences between the court and counsel regarding the resolution of legal questions, noting:

> The core of the constitutional right to be present is the right to be present when evidence is being presented. Beyond that, the defendant has a "right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. . . .' " The defendant therefore does not have a right to be present during in-chambers or bench conferences between the court and counsel on legal matters, at least where those matters do not require a resolution of disputed facts.

*Id.* at 306 (citations omitted). Because Elmore could not have done or gained

▆▆▆▆▆▆▆▆▆ ▆▆▆

during deliberations, the error we discerned in *Cuzick* is not present here. The arrival of the alternates in the jury room as the panel lined up to go into the courtroom for the reading of the verdict could not possibly have influenced the jury's already completed deliberations.

### N. The Trial Court Lacks Authority to Conduct a Proportionality Review

▆▆▆▆ Elmore asserts his sentence must be reversed because the trial court erroneously believed it did not have the authority to engage in a proportionality review. Before the trial court, Elmore moved to strike the special sentencing proceeding on proportionality grounds, asserting "[i]t makes little sense and wastes judicial resources to require a defendant to wait and see if a jury imposes death where that sentence would then be reversed on appeal on proportionality grounds." Clerk's Papers at 472. The trial court denied the motion.

In his Opening Brief of Appellant on Conflict Issues at 7-9, Elmore argues while RCW 10.95.130(2) *requires* the Supreme Court to engage in a proportionality review, it does not *prevent* the trial court from engaging in such inquiry, urging such review for the sake of judicial economy. The plain language of RCW 10.95.130, however, is determinative of this issue. RCW 10.95.130(2) states: "[w]ith regard to the sentence review required by this act, *the supreme court of Washington shall* determine: . . ."

anything had he attended the debriefing session, he had no constitutional right infringed. *See United States v. Gagnon*, 470 U.S. 522, 527, 105 S. Ct. 1482, 1484-85, 84 L. Ed. 2d 486 (1985). Furthermore, even if Elmore had a right to attend the in camera session, he waived it by his silence. *See Gagnon*, 470 U.S. at 529 (criminal defendant's failure to invoke his right to be present under Federal Rule of Criminal Procedure 43 at a conference which he knows is taking place between the judge and a juror in chambers constitutes a valid waiver of that right). Finally, as Elmore can demonstrate no prejudice resulting from his absence during the posttrial jury debriefing, *see Lord*, 123 Wn.2d at 306-07, 868 P.2d 835 (prejudice to defendant will not be presumed where he is absent from a conference he has no constitutional right to attend), the error, if any, was harmless. *Accord Rice v. Wood*, 77 F.3d 1138, 1145 (9th Cir.) (defendant's absence at return of sentence in capital case deemed harmless error because it had no substantial and injurious effect or influence on the jury's verdict), *cert. denied*, 519 U.S. 873, 117 S. Ct. 191, 136 L. Ed. 2d 129 (1996).

(emphasis added). Proportionality review is a special statutory proceeding that is conducted by this court and this court alone. RCW 10.95.100, .130(1). There is no statutory authority for a trial court to engage in a proportionality review, with the purpose of forgoing the special sentencing proceeding, as suggested by Elmore. Indeed, to do so would ignore the mandate of RCW 10.95.050 which *requires* that a special sentencing proceeding be held in cases where a defendant is adjudicated guilty of aggravated first-degree murder. Elmore's contention is meritless.

O. Mandatory Statutory Review

At the conclusion of the sentencing phase, the jury found the State had proved beyond a reasonable doubt there were not sufficient mitigating circumstances to merit leniency for Elmore. We must now review Elmore's death sentence as required by RCW 10.95 to determine:

> (a) whether there was sufficient evidence to justify the affirmative finding by the jury that there were not sufficient mitigating circumstances to merit leniency; (b) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; (c) whether the sentence of death was brought about by passion or prejudice; and (d) whether the defendant was mentally retarded.

*Brown*, 132 Wn.2d at 550;[23] *see also* RCW 10.95.130(2)(a)-(d).

In connection with this mandatory statutory review, Elmore has attempted to supplement the record. The State moved to strike this new evidence for failing to comply with RAP 9.11. We grant the State's motion.

Elmore states the Social History (Second Supplemental

---

[23]As an initial matter, Elmore challenges RCW 10.95.130, arguing the statute failed to offer a clear set of guidelines for conducting a proportionality review or a workable definition of "similar cases." Opening Br. of Appellant at 211-13. We have repeatedly considered and rejected this same argument. *Stenson*, 132 Wn.2d at 758; *Brown*, 132 Wn.2d at 554; *Pirtle*, 127 Wn.2d at 683; *Brett*, 126 Wn.2d at 207-09, 212. We do so yet again.

Clerk's Papers at 872-88) is offered for the limited purpose of addressing the "mandatory review questions" (i.e., presumably sufficiency and proportionality reviews) discussed in his Opening Brief of Appellant on Conflict Issues. But Elmore's brief references the Social History only in addressing his proportionality argument.

In general, an appellate court is confined to evidence presented to the trial court. *Erection Co. v. Department of Labor & Indus.*, 121 Wn.2d 513, 522, 852 P.2d 288 (1993); *Casco Co. v. Public Util. Dist. No. 1*, 37 Wn.2d 777, 784-85, 226 P.2d 235 (1951). We take this opportunity to indicate this rule applies in capital cases. This rule affords the trier of fact the full opportunity to consider all admissible evidence. If the evidence Elmore now seeks to bring before us were mitigating, the jury should have had a chance to assess its significance. *Cf. State v. Sagastegui*, 135 Wn.2d 67, 954 P.2d 1311 (1998) (noting the absence of mitigating evidence does not preclude or inhibit review).

In *Sears v. Grange Ins. Ass'n*, 111 Wn.2d 636, 640, 762 P.2d 1141 (1988), we held new evidence may be accepted by an appellate court only if all six criteria of RAP 9.11(a)[24] are met. *See also State v. Ziegler*, 114 Wn.2d 533, 541, 789 P.2d 79 (1990) (same), and *Washington Fed'n of State Employees, Council 28 v. State*, 99 Wn.2d 878, 884-85, 665 P.2d 1337 (1983) (same). However, while *Sears* and *Council 28*

---

[24]RAP 9.11 states:

#### ADDITIONAL EVIDENCE ON REVIEW

(a) Remedy Limited. The appellate court may direct that additional evidence on the merits of the case be taken before the decision of a case on review if: (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

state all six criteria of RAP 9.11(a) must be met, they also recognize such provisions may be waived to serve the ends of justice (RAP 1.2, 18.8). *Sears*, 111 Wn.2d at 640; *Council 28*, 99 Wn.2d at 884-85. Here, the "ends of justice" do not call for admission of the proffered Social History. A review of the record on appeal indicates the relevant information about Elmore contained in the Social History was actually presented at trial through the testimony of defense witness Michael Sparks. The proffered Social History, however, also contains much irrelevant information including: an account of the death of a neighbor child from a monkey bite where the child's Christian Scientist parents refused to seek medical aid; Elmore's twin brother's account of sexual contacts with older siblings; an older sister's account of her disappointing marriages to two alcoholic husbands; the twin brother's subsequent marriage to, and divorce from, the defendant's former wife; and a niece's account of sexual contact with the defendant's father. This additional information, although tragic, is not relevant to any issue in this case. As the events described do not involve Elmore, they do not bear on inquiries regarding mitigating circumstances or "personal characteristics" under proportionality review. Also, by containing only repetitious and irrelevant information, the Social History does not satisfy the RAP criteria for allowing additional information to be considered on review. *See* RAP 9.11(a)(1), (2), and (6). Likewise, for the same reasons, the "ends of justice" do not require our consideration of the Social History.

Elmore argues the statutory framework for mandatory review (RCW 10.95.130) contemplates we must necessarily consider such evidence, and such evidence has been so considered in other cases (citing *State v. Dodd*, 120 Wn.2d 1, 25, 838 P.2d 86 (1992); *State v. Benn*, 120 Wn.2d 631, 689, 845 P.2d 289, *cert. denied*, 510 U.S. 944, 114 S. Ct. 382, 126 L. Ed. 2d 331 (1993); and *Lord*, 117 Wn.2d at 913. First, the Social History is not necessarily required in order for us to complete a proportionality review. In *State v. Sagastegui*, 135 Wn.2d at 87-90, 954 P.2d 1311, where no

mitigating evidence was offered at trial, we rejected amici's argument that such absence precluded us from making a reasoned decision on the mandatory review issues. Rejecting amici's call for appointment of counsel to ferret out and present mitigating evidence not in the record, we held "[t]he absence of mitigating evidence does not preclude or inhibit review." *Id.* at 90.

Nor do the cases cited by Elmore support his contention that we *must* consider the untimely offered Social History. In *Benn* and *Lord*, we considered *relevant* information about the defendant, *gleaned from the record*, and bearing directly on the "personal characteristics" phase of the proportionality review. *See Benn*, 120 Wn.2d at 689 (court considered psychological experts' reports regarding defendant's manipulative tendencies); *Lord*, 117 Wn.2d at 912-13 (court considered content of defendant's statement against interest as bearing on issue of pattern of violent behavior). Again, the relevant information about Elmore found in the Social History which bears on the personal characteristics issue also appears in the record; and the Social History's "additional information" regarding the hardships of other persons is irrelevant to any proportionality review inquiry. Nothing in *Benn* or *Lord* would require us to consider the proffered Social History, which contains repeated and/or irrelevant information.

Likewise, *Dodd* does not advance Elmore's position. Like Sagastegui, Dodd offered no mitigating evidence at trial. As part of our substantial evidence review, we noted only that consideration of such alleged mitigating evidence by the jury would not have changed the verdict. *See Dodd*, 120 Wn.2d at 25. We did not, however, mention such evidence when conducting the personal characteristics inquiry. *Id.* at 27. In any event, *Dodd* is clearly distinguishable because the relevant information regarding Elmore appearing in the Social History *was* presented at trial as mitigating evidence. Its separate introduction here is superfluous. We grant the State's motion.

1. Sufficiency of the Evidence (RCW 10.95.130(2)(a))

Elmore contends there was insufficient evidence to support a death verdict in light of the mitigating circumstances he offered at the hearing. In support of his argument, he directs us to the evidence of his good prison behavior, remorse, the fact that he turned himself in and pleaded guilty, his history as an abused child, and his lack of planning in carrying out the crime.

In addressing the sufficiency of the evidence in a capital case, we determine whether sufficient evidence exists to support the jury's finding there were not sufficient circumstances meriting leniency. *Stenson*, 132 Wn.2d at 756. The test is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found sufficient evidence to justify the jury's finding beyond a reasonable doubt. *Brown*, 132 Wn.2d at 551.

In applying this test, we do not duplicate the jury's role and reweigh the aggravating circumstances against the mitigating factors, but rather we consider the circumstances of the crime along with any mitigating factors and determine whether a rational jury could have concluded the mitigating circumstances do not outweigh the circumstances of the crime. *Dodd*, 120 Wn.2d at 24-25; *Rice*, 110 Wn.2d at 623-25; *State v. Hansen*, 122 Wn.2d 712, 718, 862 P.2d 117 (1993) (State entitled to all inferences that can be reasonably drawn from evidence). The mere presence of mitigating circumstances does not require reversal if the jury is convinced the circumstances of the crime outweigh the proposed mitigating factors. *Brown*, 132 Wn.2d at 553.

Elmore's crime was particularly egregious. Elmore was entrusted to drive Kristy to school. After an argument with Kristy that morning, during which she again mentioned her prior molestation, Elmore, however, did not drop her off at school, but continued driving until he reached a remote location at Lake Samish. Until they reached the remote location, Kristy had no idea what her stepfather had planned for her. Elmore then pulled Kristy into the back of his van where he forcefully removed her clothes.

Not strong enough to resist Elmore, Kristy pleaded with him not to do this again and cried as Elmore raped her. Elmore then beat Kristy in the face, choking her first with his hands, and then with her own belt. Kristy was still making noises, so Elmore jammed a long needle-like tool into her left ear and through her brain. Believing Kristy might still be alive, Elmore placed a garbage bag over her head and bludgeoned her skull repeatedly with a sledge-hammer. After making sure Kristy was dead, Elmore dragged her body into the woods, draped a drop cloth over her and drove away. Searchers discovered Kristy's deteriorating body three days later.

Elmore used his role as Kristy's stepfather to facilitate her molestation, rape and murder. His abuse of authority, his relationship with Kristy, her young age, and the brutality of the abuse and murder intensify the heinous nature of his crime. In an attempt to conceal his actions, Elmore also misled police and lied to Kristy's mother. He then fled when he realized Kristy's body was about to be discovered.

Elmore offered mitigating testimony from several judges and an investigator from the public defender's office. The judges described Elmore's dejected demeanor during court appearances and indicated Elmore appeared willing to plead guilty. Elmore had a difficult childhood; his parents argued constantly and his father had an alcohol problem and was not steadily employed. Elmore's father disciplined the children with a belt. Elmore dropped out of school in the 11th grade, joined the Army, and was discharged in 1972 after serving in Vietnam.

The defense also argued Elmore's three felony convictions were insignificant because they would have "washed-out" under the SRA and did not constitute predicate "strikes" under the "three strikes" statute. The defense would characterize Elmore's criminal history as more of a mitigating factor rather than a consideration weighing against leniency.

Viewing all the evidence in the light most favorable to the State, a rational trier of fact could have found suf-

ficient evidence to support the jury's finding that Elmore did not merit leniency. Overcoming the setbacks of childhood and serving his country, while admirable, does not excuse or explain the heinous nature of the crime he committed. Nor does Elmore's assertion that his criminal history does not qualify as "strikes" or would "washout" under an irrelevant sentencing statute necessarily turn his criminal history into a mitigating factor. Likewise, a rational trier of fact could have interpreted Elmore's defeated appearance not as remorse or repentance, but rather as recognition he faced life imprisonment or death because of his crime.

The fact that Elmore pleaded guilty does not necessitate a verdict of life imprisonment. *Cf.* Report of the Trial Judge, *State v. Dodd*, No. 89-1-01134-4 (Clark County Super. Ct. July 26, 1990). A rational jury could well have discounted Elmore's mitigating evidence in light of the exceptionally brutal nature of his crime. As the record contains sufficient evidence to support the jury's finding that Elmore did not deserve leniency, the requirements of RCW 10.95.130(2)(a) are met.

2. Proportionality (RCW 10.95.130(2)(b))

RCW 10.95.130(2)(b) mandates we must undertake a proportionality review in every capital case to determine:

> Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120[.]

The purpose of proportionality review is to discourage "random arbitrariness and imposition of the death sentence in a racially discriminatory manner." *Brown*, 132 Wn.2d at 555; *see also Gentry*, 125 Wn.2d at

655. In meeting this purpose, we consider both the crime and the defendant in light of other "similar cases" to determine whether death was imposed *"generally* in similar cases, and not imposed *wantonly* and *freakishly."* *Brown*, 132 Wn.2d at 555. After several modifications of proportionality review,[25] and recognizing mathematical precision is unworkable and unnecessary, *Id.*, we have established a four-part test in analyzing the "crime and the defendant" in relation to "similar cases." The four factors include: "(1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history and (4) the defendant's personal history." *Id.* at 555-56. Contrary to Elmore's assertions, a statistical approach is not required. If the facts of Elmore's case are similar to some of the facts taken from cases in which the death penalty was upheld, the proportionality review is satisfied. *See id.* at 556-60. As we noted in *Dodd*:

> The concept of "proportionality" does not require precise uniformity between cases. Precise uniformity is not possible because "the brutal and extreme [crimes] with which we deal in death penalty cases, are unique and cannot be matched up like so many points on a graph." Instead, the court looks for "overlapping similarities" and common resemblances between cases.

*Dodd*, 120 Wn.2d at 26 (citations omitted). *Accord Lord*, 117 Wn.2d at 910-11.

a. Nature of the Crime

Elmore brutally raped and tortured his stepdaughter. Comparing the facts of this case with "similar cases" reveals that Elmore's crime is at least as vicious as other cases in which the death penalty was imposed. *See, e.g.*, Report of the Trial Judge, *State v. Rupe*, No. 81-1-00316-1 (Thurston County Super. Ct. June 7, 1983) (single gunshot

---

[25]*Cf. Lord*, 117 Wn.2d at 911 (suggesting a "family resemblances" approach); *Benn*, 120 Wn.2d at 680-93 (suggesting a statistically based approach); *Brown*, 132 Wn.2d at 555 n.48.

wound to the head, no torture); Report of the Trial Judge, *State v. Benn*, No. 88-1-01280-8 (Pierce County Super. Ct. June 12, 1990) (gunshot wounds to front of trunk and back of head, no torture); Report of the Trial Judge, *State v. Harris*, No. 84-1-01190-6 (Pierce County Super. Ct. Jan. 14, 1985) (gunshot wounds to head and neck, no torture, contract killing); Report of the Trial Judge, *State v. Gentry*, No. 88-1-00395-3 (Kitsap County Super. Ct. July 22, 1991) (victim chased through woods, sexually assaulted and bludgeoned to death); Report of the Trial Judge, *State v. Lord*, No. 86-1-00470-8 (Kitsap County Super. Ct. Aug. 18, 1987) (defendant took female to his house where he knocked her unconscious, raped her, and then beat her to death with a hammer). *See also Brown*, 132 Wn.2d at 557 n.56.

### b. Aggravating Circumstances

While a single aggravator will support the death penalty, *Brown*, 132 Wn.2d at 558, Elmore's crime involved two aggravating circumstances, each of which supported an enhanced penalty. A sentence of death in this case is certainly not disproportionate when compared to other cases where a verdict of death was supported by only one aggravating factor. *See* Report of the Trial Judge, *Gentry*, *Benn*, *Harris* (each finding death penalty not disproportionate based on single aggravating factor); *see also* Report of the Trial Judge, *State v. Jeffries*, No. 6488 (Clallam County Super. Ct. Nov. 18, 1983) (death penalty upheld where there were two aggravating factors).

### c. Defendant's Criminal History

Elmore's criminal history includes a 1973 conviction for first degree forgery, a 1976 conviction for burglary, and a 1977 conviction for grand larceny. Contrary to Elmore's contention, these are not all "minor property crimes." Opening Br. of Appellant on Conflict Issues at 15. Moreover, burglary is viewed as a crime of violence. *See* RCW 9.41.010(11)(a); Washington Pattern Jury Instructions: Criminal 133.51.

The death penalty has been imposed in cases where the defendant had little to no criminal history. *See* Report of

the Trial Judge, *Rupe* (no criminal history, no torture); Report of the Trial Judge, *State v. Mak*, No. 83-1-00504-0 (King County Super. Ct. Oct. 19, 1983) (no history); Report of the Trial Judge, *State v. Bartholomew*, No. 81-1-00579-1 (Pierce County Super. Ct. Dec. 21, 1981) (nonviolent theft, trespass, possession of stolen property, no physical torture of victim); Report of the Trial Judge, *State v. Rice*, No. 85-1-01004-0 (King County Super. Ct. July 21, 1986) (nonviolent history of lewd conduct and grand theft auto); Report of the Trial Court, *Benn* (nonviolent thefts, grand larceny and numerous misdemeanors). Elmore's death sentence is not disproportionate when compared to the nonviolent nature of Benn's, Bartholomew's, and Rice's criminal pasts, and the complete nonexistence of criminal history in *Rupe* and *Mak*. *See also Dodd*, 120 Wn.2d at 27 ("Lack of criminal history, alone, however, does not render a sentence disproportionate.").

d. Defendant's Personal History

Elmore's personal history does not excuse his crime. "The role of mitigation evidence is to reduce culpability for a crime that has already been proved." *Pirtle*, 127 Wn.2d at 688. Elmore offered "mitigating evidence" that his alcoholic father hit him with a belt and was generally abusive. Although commonly asserted, a history of abuse as a child seldom affects the outcome of aggravated first-degree murder cases. *Id.*; *Brown*, 132 Wn.2d at 559. *See also Rice*, 110 Wn.2d at 592-96 (deep personality disorder but no organic brain dysfunction, death penalty upheld).

Thus, we have previously affirmed a verdict of death in cases where the facts are less brutal and include fewer aggravating factors, where the defendant had no criminal history, and where more mitigating factors existed. Given the very clear parallels to *Gentry* and *Lord*, we cannot say Elmore's death sentence shocks the conscience of this court. Elmore's death sentence is neither excessive nor disproportionate to other cases in which the death penalty has been

imposed. The requirements of RCW 10.95.130(2)(b) are met.[26]

3. Passion or Prejudice, and Mental Retardation

Regarding our final two inquiries required by RCW 10.95.130(2), Elmore does not argue that the jury's verdict was the result of passion or prejudice. RCW 10.95.130(2)(c). Indeed, nothing in the record would support such an assertion. As to the final inquiry of whether the defendant was mentally retarded, RCW 10.95.130(2)(d), mental disability was never an issue in this case and Elmore never claimed it was. In fact, during Elmore's July 6, 1995 guilty plea hearing, Elmore's attorney assured the court Elmore was mentally competent.[27]

## CONCLUSION

We have carefully reviewed the errors claimed by Elmore and the mandatory statutory review issues. We find no reversible error in Elmore's conviction or the jury's sentence of death. In light of the circumstances of Elmore's brutal murder of his stepdaughter, we affirm his conviction for aggravated murder in the first-degree and the jury's death sentence.

GUY, C.J., SMITH, JOHNSON, MADSEN, and ALEXANDER, JJ., and DOLLIVER, J. PRO TEM., concur.

SANDERS, J. (dissenting) — The majority would send Clark Elmore to the executioner's table notwithstanding effective denial of his constitutional right to counsel at a critical

---

[26]Elmore argues it is inappropriate to use for comparison purposes the *Rupe, Mak, Rice, Jeffries, Harris* and *Bartholomew* cases because those defendants are no longer subject to the death penalty. Reply Br. of Appellant on Conflict Issues at 2. However, in our proportionality review in *Brown*, we have still relied on *Rupe, Rice, Jeffries,* and *Harris,* among other cases. *See Brown,* 132 Wn.2d at 553-60. Such reliance was appropriate there, as it is here, because none of the cases Elmore lists were overturned for the reasons they are cited here.

[27]Elmore also argues cumulative error to support his contentions. We believe such argument is meritless for the reasons we have previously articulated.

stage in the penalty phase proceeding. Without notice to or argument from counsel, and without even a conscious decision from the trial judge, a tape player was placed in the jury room enabling the jury to repeatedly replay a tape of Elmore's confession, redacted to exclude his expressions of remorse. This error of constitutional significance requires reversal of Elmore's death sentence and a new penalty phase trial to ensure fairness to the condemned man.

The Sixth Amendment to the United States Constitution guarantees "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. CONST. amend. VI. This portion of the Sixth Amendment is binding upon the states through the due process clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799, 93 A.L.R.2D 733 (1963). Our state constitution similarly provides "[i]n criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel . . . ." WASH. CONST. art. I, § 22 (amend. 10). A criminal defendant's right to counsel guaranteed by the federal and state constitutions is not merely a simple right to have counsel appointed but is a substantive right to meaningful representation. *See Evitts v. Lucey*, 469 U.S. 387, 395, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985) ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits."); *Strickland v. Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled.") (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 276, 63 S. Ct. 236, 87 L. Ed. 268, 143 A.L.R. 435 (1942)); *Avery v. Alabama*, 308 U.S. 444, 445, 60 S. Ct. 321, 84 L. Ed. 377 (1940).

We have upheld the Sixth Amendment right to counsel

at any stage of proceedings where there is a possibility of prejudice to the defendant. *Garrison v. Rhay*, 75 Wn.2d 98, 102, 449 P.2d 92 (1968) ("The constitutional right to have the assistance of counsel arises at any critical stage of the proceedings, and a critical stage is one in which there is a possibility that a defendant is or would be prejudiced in the defense of his case."); *see also Hamilton v. Alabama*, 368 U.S. 52, 53, 82 S. Ct. 157, 7 L. Ed. 2d 114 (1961) (right to counsel attaches at any "critical stage in a criminal proceeding"). This means critical aspects of the proceeding must be conducted in the presence of defense counsel, with notice and opportunity for full participation on behalf of his client. *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981) (holding Sixth Amendment right to counsel was violated when defense counsel was not notified in advance about the nature of a psychiatric examination).

The decision to deliver a tape playback machine to the jury room is critically important because it allows special emphasis to be placed on the taped evidence by unlimited repetition, unlike listening to evidence in open court which is not repeated, not taken to the jury room, and which must be remembered to be considered. *See State v. Frazier*, 99 Wn.2d 180, 190, 661 P.2d 126 (1983) ("[T]rial court judges should continue to be aware of the potential for overemphasizing the importance of such [tape-recorded] evidence."). Delivery of a tape player to the jury room was especially critical in this case because the tape of Elmore's confession was redacted to omit a portion in which he expressed remorse for the crime.[28] The defense initially objected to this redaction, Clerk's Papers (CP) at 202, but

---

[28]The redacted portion of the tape-recorded interview between Detective Gitts and Elmore (referred to in the transcript of the tape as "Dickey") contained the following exchange:

GITTS: And your relationship with KRISTY, and such, did you guys toler-ate each other, like each other, absolutely hate each other, or you tolerate her, she hates you, or what sort of situation would you call that?

DICKEY: We barely tolerated each other.

GITTS: Okay.

subsequently relented on the understanding that Detective Gitts would testify in open court to the redacted portion of the confession. Verbatim Report of Proceedings (RP) (Mar. 6, 1996) at 2214-15, RP (Mar. 7, 1996) at 2392. But had defense counsel been notified that the jury would be allowed to repeatedly play the redacted version of the tape in the jury room, the defense would have had good reason to object to the redaction and/or placing the tape player in the jury room. CP at 103, 105 (affidavits of defense counsel, swearing they were not informed a tape player was placed in the jury room).[29] Therefore denial of the opportunity for counsel to be heard on the issue of the tape player was denial of Elmore's right to counsel. *Cf. Herring v. New York*, 422 U.S. 853, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) (holding statute permitting judge to deny counsel opportunity for closing argument violated criminal defendant's constitutional right to counsel).

The potentially undue emphasis a jury might give the redacted tape under the circumstances of this case must be a factor gravely considered by the trial court based upon the best available advocacy of both parties, as the jury may consider "any relevant factors" in its deliberation on the death penalty and its decision to spare the life of the accused is necessarily subjective. RCW 10.95.070. The defendant's remorse for the crime is certainly a factor the jury may consider in favor of leniency. *State v. Benn*, 120 Wn.2d 631, 691, 845 P.2d 289 (1993) ("remorse or confession of a crime by the defendant may be viewed by prosecutors or juries as significant mitigation"); *see also State v. Saga-*

---

DICKEY: Which, again, is probably my fault. After all this was said and done, then I started to realize where I had made a lot of mistakes with KRISTY. 'Cause the only time I ever talked to KRISTY was to yell at her for something that she didn't do that she was supposed to do. I didn't ever spend any time with KRISTY. Maybe this is because of the first time, I felt so guilty about it.

Clerk's Papers (CP) at 274-75.

[29]Although the prosecutor stated in an affidavit that he told the court "at the conclusion of the arguments on the 11th day of March, 1996" that a tape player would be used during jury deliberations, CP at 82, the record does not reflect such a discussion. Verbatim Report of Proceedings (Mar. 11, 1996) at 2647-48.

*stegui,* 135 Wn.2d 67, 96, 954 P.2d 1311 (1998) (affirming death sentence stating, "[The defendant's] own admission to the jury reveals that he is totally without remorse. Indeed, his attitude has not changed since the time of trial."); *State v. Lord,* 117 Wn.2d 829, 907, 822 P.2d 177 (1991) ("[The defendant] showed no remorse for any of his crimes. There was sufficient evidence for a rational trier of fact to find that leniency was not merited."), *denial of habeas corpus rev'd sub nom. Lord v. Wood,* 184 F.3d 1083 (9th Cir. 1999).

Repetition of a tape-recorded confession altered to remove remorse might make the difference between life and death in a system which requires a jury to be unanimous in its decision to impose a death penalty, sparing the life of the accused if only one juror finds the defendant sufficiently remorseful to merit leniency. RCW 10.95.060(4). Indeed the record shows the jury in this case "listened to and discussed" the redacted tape. CP at 108, 110; RP (May 3, 1996) at 15.

Because Elmore's life was at stake in the proceeding below, the standard of review requires us to give the "utmost solicitousness" to Elmore's position. *State v. Martin,* 94 Wn.2d 1, 21, 614 P.2d 164 (1980). Death is indeed different. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.").

Although positioning a tape playback machine in the jury room was clearly a critical stage of proceedings to which the right to counsel attaches, Elmore was denied effective representation of counsel when the jury was simply given access to a tape player without notice to or opportunity for argument from Elmore's counsel. The

redacted tape of the confession was admitted into evidence by the prosecution as Exhibit 18 (CP at 575), although the tape player was not admitted into evidence (CP at 575-76) nor was a motion made, much less granted, to allow its use in the jury room. The record is barren of any indication the trial judge even considered whether the jury would be provided a tape player for its unlimited use during deliberations. Nor is there any finding that defense counsel had knowledge the tape player would be sent to the jury room. Rather the bailiff "automatically" took the exhibits and the tape player back to the jury room when the jury was sent to begin deliberation. CP at 106.

Although Elmore forcefully argues the absence of argument by counsel or ruling by the trial judge regarding the tape player resulted in denial of his constitutional right to counsel, Opening Br. of Appellant at 40-66; Reply Br. of Appellant at 3-32, the majority fails to even address this fundamental claim in its opinion. Instead the majority assumes *State v. Castellanos*, 132 Wn.2d 94, 935 P.2d 1353 (1997), holds tape players are legitimately sent to the jury room as the norm absent court action to the contrary. Majority at 296 ("[O]nce admitted into evidence, an exhibit may be used by the trier of fact in whatever fashion it chooses under CrR 6.15(e)."). But *Castellanos* says the opposite. In *Castellanos*, tape recordings of a drug transaction were admitted into evidence without objection and were played in open court. *Castellanos*, 132 Wn.2d at 96. Then the defendant was given actual notice and opportunity to object to provision of a tape playback machine to the jury—and did in fact object. *Id.* Based on this proper and reasoned objection the trial court carefully considered the issue, ultimately allowing the jury unrestricted access to the tape player. *Id.* at 97. This court affirmed "[t]he trial court's *decision* to allow the jury unlimited access to the tapes with playback equipment was not an abuse of discretion," *id.* at 102 (emphasis added), stating:

> tape recorded exhibits *may* go to the jury and the jury *may* take such exhibits into the jury room "*if,* in the *sound discre-*

*tion of the trial court*, the exhibits are found to bear directly on the charge and are not unduly prejudicial."

*Id.* at 100 (emphasis added and omitted) (quoting *State v. Frazier*, 99 Wn.2d 180, 189, 661 P.2d 126 (1983)).

The rule in *Castellanos* is that absent a motion and affirmative ruling by the trial judge, tape players *do not* go to the jury.

While the result in *Castellanos* is clearly premised on the trial court's hearing argument from counsel and exercising its discretion by making an actual overt and conscious decision as to whether the tape player should be allowed in the jury room, here there was no decision, no consideration, and no exercise of discretion which we might review for abuse. The true meaning of *Castellanos* is implicitly recognized elsewhere in the majority opinion which correctly characterizes *Castellanos* as holding "the trial court's *decision* to *allow* the jury unlimited access to the tapes with playback equipment was not an *abuse of discretion*." Majority at 295 (emphasis added).

As *Castellanos* clearly holds, the *trial judge* has *discretion* to allow the jury access to a tape player during deliberation, *Castellanos*, 132 Wn.2d at 100, *Castellanos* supports Elmore's argument that an error occurred when no discretion was exercised. This case presents stronger facts militating against sending the tape player to the jury than those present in *Castellanos* because in *Castellanos* the tapes had not been edited. *Castellanos*, 132 Wn.2d at 102 ("The tapes . . . were contemporaneous recordings of drug transactions.").

But the exercise of discretion by the trial judge in *Castellanos* is not the only ground upon which *Castellanos* must be distinguished from the present case. Because the tapes in *Castellanos* were contemporaneous tape recordings of drug transactions, they were nontestimonial. *Castellanos*, 132 Wn.2d at 102 ("The tapes at issue here were not testimonial."). However, the tapes in the present case *were* testimonial in nature because they were recordings of a

confession during which a detective asked questions, eliciting answers from Elmore. *See State v. Jennings,* 815 S.W.2d 434, 440 (Mo. Ct. App. 1991) (taped confession testimonial), and *see* BLACK'S LAW DICTIONARY 1476 (6th ed. 1990) (defining "[t]estimonial" as "[i]n the nature of testimony. Evidence is said to be testimonial when elicited from a witness *in contrast to documentary evidence or real evidence."*). *But see Yung v. State,* 906 P.2d 1028, 1036 (Wyo. 1995) (taped confession nontestimonial).[30] This court has never before held that a testimonial exhibit may go to the jury and should not so hold in this case.

The majority argues even if this were constitutional error it was harmless because "there is no indication here the content of the tapes caused such an emotional response in the jury as to overpower reason." Majority at 296. But what does the majority expect to find, and where would it look? Such is not even a legitimate inquiry because the jury's consideration of the evidence, and the weight given to it, inheres in the verdict:

> The mental processes by which individual jurors reached their respective conclusions, their motives in arriving at their verdicts, *the effect the evidence may have had upon the jurors* or the weight particular jurors may have given to particular evidence, or the jurors' intentions and beliefs, are all factors inhering in the jury's processes in arriving at its verdict, and, therefore, inhere in the verdict itself, and averments concerning them are inadmissible to impeach the verdict.

*Cox v. Charles Wright Academy, Inc.,* 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967) (emphasis added); *see also In re Personal Restraint of Lord,* 123 Wn.2d 296, 327, 868 P.2d 835 (1994); *State v. Ng,* 110 Wn.2d 32, 43, 750 P.2d 632 (1988); *State v. Whitney,* 96 Wn.2d 578, 580 n.1, 637 P.2d 956 (1981); *State v. Crowell,* 92 Wn.2d 143, 146, 594 P.2d

---

[30]The majority states that in *Castellanos* we cited *Yung* "with approval." Majority at 295. However the citation to *Yung* in *Castellanos* was clearly intended to highlight the distinction between testimonial and nontestimonial exhibits, not to place our imprimatur on an application of the rule to facts not then before us. *Castellanos,* 132 Wn.2d at 100 (discussing the law in other states).

905 (1979). As evidence of jurors' "emotional response" inheres in the verdict, it cannot by its nature be discerned from the record. The majority's reliance on a lack of evidence in the record of "emotional response" on the part of the jury is execution by bootstraps.

The majority also argues any error was harmless because the jury heard other evidence of Elmore's remorse. Majority at 296-97. However in so concluding the majority effectively weighs the evidence, and usurps the function of the jury which is uniquely charged with the task of weighing the evidence presented at the crucial sentencing phase of a death penalty case. RCW 10.95.070. The majority also completely overlooks the presumption, clearly articulated in our case law, that an error of constitutional magnitude is *presumed prejudicial. State v. Finch,* 137 Wn.2d 792, 859, 975 P.2d 967 (1999), *pet. for cert. filed* (July 1, 1999); *State v. Stephens,* 93 Wn.2d 186, 190-91, 607 P.2d 304 (1980); *State v. Burri,* 87 Wn.2d 175, 181-82, 550 P.2d 507 (1976) (violation of a defendant's constitutional right to counsel is presumed prejudicial); *State v. Robinson,* 38 Wn. App. 871, 876, 691 P.2d 213 (1984). The burden is on the state to demonstrate harmlessness. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). It is all the more difficult to conclude an error was harmless, and all the more difficult to overcome the presumption, given the subjective nature of a jury's decision to impose the death penalty. *Finch,* 137 Wn.2d at 863 ("The evidence considered during the special sentencing proceeding is of a more subjective nature dealing with not only the nature of the crimes involved but also with personal history and the character of the Defendant.").

Violation of Elmore's constitutional right to counsel could arguably be harmless only if the trial judge could not, as a matter of law, have decided to withhold the tape player from the jury. But the majority does not even claim a decision to withhold the tape player under these facts would have been abuse of the trial court's discretion.

The *failure* of the trial court to exercise discretion regard-

ing jury access to the tape player and the consequent effective denial of Elmore's right to counsel at this crucial stage of proceedings was constitutional error and error which we must assume prejudiced the accused. That presumption of prejudice has not been overcome. The standard of review mandates we not allow another life to be taken in lieu of a new penalty trial where critical decisions are knowingly made by the trial court after benefit of advice and argument by counsel for the accused.